THE TRI-BULLION SMELTING AND DEVELOPMENT COMPANY, Respondent, v. JOHN B. CORLISS and Others, Defendants, Impleaded with ALLEN CURTIS and Others, Appellants.

First Department, March 7, 1919.

Corporation — action against directors of corporation to recover moneys misappropriated by treasurer — negligence of directors in failing to discover defalcation.

Action against the former directors of a corporation to recover moneys misappropriated by the treasurer of the corporation while the defendants were in office upon the ground that the negligence and want of care of the defendants made it possible for the treasurer to carry on his thefts. Several schemes to defraud the corporation were used by the treasurer: *First*, by means of false entries of checks drawn to fictitious persons which were substituted for checks which the treasurer had cashed and appropriated the proceeds; *second*, after checks upon which he had drawn money were returned he erased the name of the payee and substituted that of a fictitious payee and also forged the indorsement of the payee and of various banks; *third*, the treasurer, in order to mislead the directors, prepared items covered by the spurious checks in the names of

the fictitious payees and forged the signature of the manager of the corporation approving said bill and made fictitious entries to correspond with such bill. Under the by-laws of the corporation money could only be withdrawn from banks of deposit by checks signed by the treasurer and countersigned by the president, or by a director of the corporation, and it appeared that the treasurer, on presenting the fictitious checks, had obtained the genuine signatures of said officers. The defendants were further misled by the fact that auditors appointed by them did not discover the treasurer's peculations. The by-laws of the company required the directors to hold monthly meetings at which financial statements were to be filed by the treasurer, but the evidence showed that no financial statements were ever called for or made and that proper meetings were not held by the directors. On all the evidence,

*Held,* that the directors were negligent in failing to hold the monthly meetings and in failing to require a financial statement from the treasurer, and that as they had countersigned the fictitious checks at a time when the corporation was not carrying on active business a verdict for the plaintiff based on the defendants' negligence should be affirmed.

*Held further,* that a finding of the jury charging the defendants with negligence in failing to discover the dishonesty of the treasurer at a time when the corporation had been actively engaged in business and spending money was not justified and that a new trial should be granted unless the plaintiff stipulates to reduce the verdict.

Appeal by the defendants, Allen Curtis and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 11th day of April, 1918, upon a verdict, and also from an order entered on the 5th day of April, 1918, denying a motion for a new trial made upon the minutes.

*Richard T. Greene* of counsel [*Daniel S. Murphy* with him on the brief; *Greene, Hurd & Stowell,* attorneys], for the appellants.

*H. V. M. Dennis, Jr.,* of counsel [*Charles Paul Brown* with him on the brief; *Brown, Cooksey & Myers,* attorneys], for the respondent.

Merrell, J.:

This action is brought by the plaintiff, an Arizona corporation, to recover of the defendants, who were formerly directors of the company, moneys misappropriated by one Harry J. Clarke, the treasurer of said plaintiff corporation, at a time when said defendant directors were serving as such. Service

of the summons herein was only made upon three of the defendants, who are the appellants Allen Curtis, Ellis P. Earle and Howard Paschal.    After the service of the summons and complaint upon said defendants, the defendant Earle made a motion to make the complaint herein more definite and certain; the defendant Curtis demurred to the complaint; and the defendant Paschal answered.    All were represented by the same counsel.    Thereafter, at separate hearings, the demurrer was overruled, and the motion to make the complaint more definite and certain denied.    Appeals from the respective orders therein were taken to the Appellate Division, where the Special Term in each case was affirmed.    (*Tri-Bullion Smelting & Development Co.* v. *Earle,* 175 App. Div. 936; *Tri-Bullion Smelting & Development Co.* v. *Curtis,* Id.)    Thereupon the defendants Curtis and Earle answered in the case in substantially the same form as the answer theretofore served by the defendant Paschal.    Plaintiff's complaint was amplified by a bill of particulars.    Upon the trial of the issues the jury rendered a verdict in plaintiff's favor for $39,204.01, being the amount claimed to have been misappropriated by plaintiff's treasurer, together with interest thereon to the date of trial. Defendants, appellants, moved to set aside the verdict and for a new trial, which motion was denied, and judgment was entered upon the verdict in plaintiff's favor and against the defendants, appellants, and this appeal is taken by said appellants from such judgment and order.

The defendants, including the appellants herein, were elected directors of the plaintiff corporation on or about July 8, 1912, and qualified as such on July 9, 1912.    Said defendants were duly re-elected and qualified as directors of said plaintiff on or about March 30, 1914.    The defendants served as such directors and assumed to discharge their duties as such from on or about July 9, 1912, until they were ousted from office by the election and qualification of successors in January, 1916. From July 8, 1912, until January, 1916, the said Howard Paschal was the president of the plaintiff, and each of the appellants, Paschal, Earle and Curtis, was a director.    The said Harry J. Clarke was secretary and treasurer, but was not a director of the corporation.    The evidence discloses that during their service as such directors, and commencing

February 21, 1913, and until March 10, 1915, the said Clarke, by means of false entries in books, checks drawn to fictitious persons, or otherwise, misappropriated of the funds of said corporation the aggregate sum of $31,776.67. These peculations are made up of twenty-seven different items. Checks were prepared by Clarke in such a manner as to enable him to obtain the money thereon from the respective banks upon which the checks were drawn, and wherein the plaintiff was a depositor. Under the by-laws of the corporation, money could only be withdrawn rom banks containing deposits of the plaintiff by means of checks signed by the treasurer and countersigned by the president or a director of the corporation. The moneys of the corporation from which the treasurer, Clarke, misappropriated the plaintiff's funds, were deposited in two different banks. During the earlier part of his peculations plaintiff's depositary was the Chatham and Phenix National Bank in New York city. The misappropriation of the moneys in the Chatham and Phenix Bank was represented by eight different checks drawn from February 21, 1913, to June 21, 1913, inclusive, but the checks upon which the money was drawn were destroyed and eight others drawn to fictitious payees were substituted in their place. These several substituted checks were either drawn to Kittredge & Hobbs, Inc., or Morris Pump Company. Both of these payees were concededly fictitious. The remaining nineteen items of peculation were after the plaintiff had become a depositor in the National State Bank of Newark, N. J. The testimony shows that the entire twenty-seven items of misappropriation were paid out by the banks over their counters. The dishonest treasurer apparently had two methods to obtain the plaintiff's moneys. One of said methods, by which the eight withdrawals were made from the Chatham and Phenix National Bank and seven withdrawals were made from the National State Bank at Newark, N. J., was to prepare a check payable either to bearer or to cash and send it by the plaintiff's stenographer to the bank to be cashed. Clarke then evidently drew corresponding checks of even date with those used in withdrawing the money, payable to fictitious persons at distant points. As soon as the canceled check upon which the money was actually paid to bearer or to cash or in whatever

way he was able to get money from the bank was returned, the check thus used to obtain money was destroyed, and the check of even date and amount drawn to a fictitious payee and duly camouflaged with the indorsement of the payee and banking institutions through which the check had apparently passed until returned to the plaintiff's office, was substituted. These substituted fraudulent vouchers were, of course, to be exhibited, if called for, to the directors of the plaintiff or to the expert public accountants employed by the plaintiff to oversee and audit its accounts.

As to the fifteen canceled checks which were produced upon the trial, the officers of the banks upon which they were drawn testified that the checks produced were never paid by them, but that their books showed like amounts on corresponding dates of withdrawals from the funds of the plaintiff company in their institutions.

As to the remaining twelve items of peculation the treasurer, Clarke, pursued a different course. The canceled checks which were produced were shown to have been paid by the National State Bank of Newark, N. J., but after they were paid they had been altered by erasing the name of the payee, in the place of which had been typewritten the name of a fictitious payee and the same camouflage as to indorsement by the payee and the various banks was placed upon the back of each of said checks.

Clarke's dishonesty commenced on February 21, 1913, when he withdrew from the Chatham and Phenix National Bank of plaintiff's funds there on deposit the sum of $2,760.15, and to cover which he prepared a check to Kittredge & Hobbs, Inc., a concededly fictitious payee, and placed the same with plaintiff's returned vouchers to satisfy the scrutiny of plaintiff's accountants when later they might examine into the transaction. Thereafter, on various dates down to June 21, 1913, and in various amounts, and adopting the same means of concealing his dishonesty, Clarke withdrew other amounts of plaintiff's moneys from the Chatham and Phenix National Bank. In all, said peculations, during the four months from February 21, 1913, to June 21, 1913, aggregated in amount $8,979.08, and involved eight distinct withdrawals, and were covered by eight bogus checks to fictitious payees and which

purport to have been indorsed by the several payees and to have passed through various banking institutions, including the New York Clearing House, and to have been eventually paid by the Chatham and Phenix National Bank, the depositary upon which they were apparently drawn, and each bears the perforated marks, " Cancelled " and " Paid." These eight spurious checks upon their face bear every evidence of genuineness, but admittedly the bank paid no money out upon them. It did pay out on or about the several dates which the checks bear corresponding amounts, but the checks which were actually cashed have been destroyed, and the bogus checks substituted. In order to avoid detection the dishonest treasurer inaugurated a comprehensive system designed to deceive plaintiff's officers and directors and to elude the vigilance of expert accountants employed by plaintiff to audit its accounts. During its activities the expenditures of the corporation were chiefly in the West at the seat of its mining operations. The withdrawals represented by the fraudulent transactions in suit purported to be made in payment of current expenses incurred at the mines in connection with their operation. Under plaintiff's course of business, all bills for expenses of operation were required to be approved by plaintiff's general manager, Bull, before payment. Accordingly, as a step in his system and to mislead plaintiff's directors and accountants, Clarke prepared bills for the items covered by the spurious checks, in the names of the fictitious payees, forged the signature of plaintiff's manager, Bull, approving said bills, and filed the same among plaintiff's papers. In plaintiff's books of account Clarke made fictitious entries to correspond with such bills. It will, therefore, be seen that the dishonest treasurer's system was quite elaborate and served effectually to hide his defalcations from plaintiff's directors and to elude the scrutiny of those employed to examine its accounts.

This system seems to have entirely escaped detection by the board of directors, and this action is brought by the corporation to recover from the directors, and a verdict and judgment have been entered therein in favor of the plaintiff based upon the negligence and want of care of said directors making it possible for the dishonest treasurer to carry on his thefts.

Each of the vouchers that is produced is countersigned by the president or a director of the corporation, and no evidence was given upon the trial disputing the genuineness of the signatures of said president and directors thereon. Each check bears the genuine signature of the dishonest treasurer. Of the twelve checks showing the erasure of the name of the payee and the substitution of a fictitious payee, the president, Howard Paschal, signed eight, and the defendant, Allen Curtis signed one of them. Both Curtis and Paschal were sworn as witnesses upon the trial, and neither disputed the genuineness of the signatures upon these checks. There was no evidence upon the trial in any manner questioning the signatures upon the various checks produced. It is not clear how this money could have been obtained by the treasurer through the countersigned signatures of the president and directors without the attention of the latter being drawn to the irregularities. Under the by-laws of the plaintiff, money could only be drawn, from banks wherein plaintiff's funds were deposited, by means of checks signed by plaintiff's treasurer and countersigned by its president or some one of its directors. Each of the destroyed checks for the fifteen items of withdrawal, for which the fifteen checks drawn to fictitious payees were substituted, must have been countersigned either by the president or a director of plaintiff before presentation for payment at the bank upon which it was drawn. These checks which the bank paid have been destroyed, and it is, therefore, impossible to say whether the counter-signatures were genuine. No claim was made upon the trial that the destroyed checks were not properly countersigned, and each of the fifteen substituted checks appears to be countersigned either by the president or a director of plaintiff. The genuineness of neither of such counter-signatures was questioned upon the trial, nor was the genuineness of the counter-signatures upon either of the remaining twelve checks questioned, although the persons countersigning nine of the twelve checks were present and testified upon the trial. The genuineness of such counter-signatures being thus tacitly admitted, speculation is aroused as to how the twenty-seven checks produced at the trial came to bear genuine counter-signatures of either the president or a director of plaintiff, and fifteen of which

were drawn to take the place of the ones destroyed, upon which the money was obtained. It is quite incomprehensible how plaintiff's president and the directors who countersigned these various checks, fifteen of them being duplicated as to date and amount, can still plead ignorance of the raids that were being made upon its bank deposits. The only explanation of the facility with which the treasurer, Clarke, was able to produce duly countersigned checks lies in the possibility that plaintiff's president and directors, having entire confidence in his honesty and trustworthiness, furnished Clarke with a quantity of checks countersigned in blank, and permitted him to fill out and use the same as the business of the corporation required. This, if true, would, of course, be gross negligence on their part, rendering them responsible for loss resulting therefrom. Of course, if this money was obtained from the banks through forged paper, it might be that the defendants would not be liable therefor, as it might appear that, even if they exercised due care, they would be, perhaps, unable to guard against the forgery of their treasurer, and the bank, having paid out the moneys on forged instruments without authority from the plaintiff in any way, would be held responsible therefor, and the plaintiff would not have suffered loss, and would, therefore, have no cause of action against the directors. But even had it appeared that the moneys were obtained upon forged paper, still the directors had a duty to perform, and if, owing to negligence on their part, they permitted such forgeries to occur, and if, as the result of their lack of attention to their official duties as directors, they failed to discover the inroads upon their bank deposits, their conduct might be held to be so negligent as to absolve the bank from responsibility.

The law is well settled that while a bank may primarily pay and charge to its depositor only such sums as are duly authorized by the latter, and while a forged check is not authority for such payment, still if the depositor is guilty of negligence which contributed to such payments and the bank itself has been free from negligence, the bank may be relieved from liability to repay the amounts thus paid out on forged paper. (*Morgan* v. *United States Mortgage & Trust Co.,* 208 N. Y. 218.)

But these moneys were not obtained through forgery. So far as the evidence discloses each of the checks bore the genuine signature of plaintiff's treasurer and was countersigned by its president or one of its directors. Upon their face, so far as appears, the checks were regular. Although drawn to fictitious payees, the signature of no person was forged. What the dishonest treasurer of plaintiff did was to misappropriate to his own use the moneys of his employer of which he wrongfully obtained possession in some manner not clearly disclosed by the evidence.

It is claimed by the plaintiff that the defendants, as such directors, including the three appellants, were so careless and negligent in the manner in which they discharged their duties as directors of the plaintiff corporation during the time of Clarke's misappropriations, that he was able to carry on the same, and that the exercise of that degree of diligence which an individual would exercise toward his own affairs would have discovered the treasurer's dishonesty and prevented the loss.

The plaintiff was organized under the laws of the State of Arizona, and carried on mining operations at two different points, one at mines known as the Kelly Group, at Kelly, N. M., and the other at mines known as the Nitt Group, at Kelly, N. M., a distance of three-quarters of a mile from the Kelly Group. The company also owned two other mining projects, one in Montana and the other in Arizona, but neither of said last-mentioned mines was developed nor productive. For a number of years the Kelly and Nitt Groups had been in operation with varied success. That the mines were running at a loss began to be apparent in the latter part of the year 1912, and operations were finally discontinued in both the Kelly and Nitt Groups in May or June, 1913.

The moneys of the company were, in 1913, until November eighth, deposited with the Chatham and Phenix National Bank of New York city, and thereafter the plaintiff's principal depositary was the National State Bank of Newark, N. J., before mentioned. The plaintiff company employed as a general manager at its base of operations one Robert W. Bull, who had authority to O. K. vouchers and make expenditures at the mines. For this purpose a bank account was

kept at Socorro, N. M., which was, from time to time, as occasion required, replenished with remittances from New York. The plaintiff maintained a business office at the city of New York. This office consisted of three rooms, one being a general office, one occupied by the president, Paschal, and the other by the treasurer, Clarke, the office force consisting of the president, treasurer and a stenographer. The plaintiff employed to audit its books and business affairs a reputable firm of public accountants, who during the period of time the treasurer was carrying on his peculations made frequent examination of the books, vouchers and business affairs of the corporation, but appears to have remained in ignorance of the misappropriations carried on by the dishonest treasurer. But two of the reports of these accountants were offered in evidence. It would appear that other and frequent reports were made by these accountants, but they were not introduced in evidence, so we are not able to know what such reports contained. It would seem that such reports must have advised the defendants, as directors of plaintiff, of the condition of the plaintiff's bank account. By one of the accountants' reports, made to plaintiff's directors at a meeting held June 18, 1913, the directors were informed that in the course of their examinations into plaintiff's affairs the accountants had found that in a majority of cases vouchers for expenditures at New York were not approved for payment, and that the same was true in a number of cases as to vouchers from plaintiff's mine. The accountants advised that in the future all vouchers should be approved. The report called attention to four missing vouchers, and to the fact that on April 30, 1913, Clarke had overdrawn his salary allowance by $385, which overdraft, on June 7, 1913, he had reduced, so that on said last-mentioned date the amount received by him beyond salary due was $160, and that he promised within the succeeding three weeks to entirely wipe out such overdraft. The other report of said accountants, which was received in evidence upon the trial, bears date April 14, 1914, and therein the directors were advised that in a number of cases vouchers were not fully approved. These reports, showing that moneys were being disbursed upon unapproved vouchers, and that plaintiff's treasurer was overdrawing his salary in a substantial

amount, seem to have in nowise excited the suspicions of plaintiff's directors. During the greater part of Clarke's dishonest practices, plaintiff's mines had been shut down, and there was little cause for expenditure of moneys. The directors knew that operations at the mines ceased in May or June, 1913, and thereupon expenditures stopped. Perhaps the withdrawals while the mines were active, and prior to June 21, 1913, would not have attracted the attention of reasonably prudent men. These dishonest withdrawals made from the Chatham and Phenix National Bank aggregated the said sum of $8,979.08. In view of the activities of plaintiff's mines, its directors may be excused from discovering its treasurer's dishonesty, but as to the balance of the peculations, covering a period from November 11, 1913, to March 16, 1915, no such excuse for want of vigilance exists. The directors should have known that there was no reason for the nineteen withdrawals during such period of inactivity, aggregating in amount the sum of $22,797.59. A cursory glance at the books of the corporation would have shown that such expenditures were out of all proportion as compared with former years when the mines were active and expenditures necessary. Had any examination at all been made of the bank accounts it would have at once been manifest that frequent and heavy withdrawals were being made at this time when the business of the plaintiff was at a standstill, and little moneys were required to be withdrawn in carrying on the same. The by-laws of the company provided that the board of directors should hold meetings once in each month, and said by-laws also required that financial statements by the treasurer be made at each meeting of the board of directors. The minutes fail to show that any statements were ever called for or made by the treasurer as required by the by-laws. Meetings were not held by the directors as required by the plaintiff's by-laws. No meeting was held by the board of directors between July 9, 1912, and April 21, 1913, a period of over nine months; from April 21, 1913, no meeting was held until June eighteenth in the same year, a period of nearly two months; after June 18, 1913, the next meeting was held August 28, 1913, over two months later; the next meeting after August 28, 1913, was held July 10, 1914, nearly a year later; and after July

10, 1914, no meeting was held until June 28, 1915, nearly a year later; and the last meeting of the board of directors comprising the defendants herein was held December 2, 1915. It would seem from the evidence that these meetings were of little account and perfunctory, and that at them no reports were made by the treasurer as required by the by-laws. It seems to me that the directors were clearly negligent in failing to hold meetings of their board as required by the by-laws and in failing to obtain from their treasurer a statement at each meeting of the financial condition of the corporation. Had such meetings been held the directors would have at least had an opportunity to discover the condition of the corporation's affairs. Had the treasurer furnished the directors with the reports called for by the by-laws, they would have shown the amount of cash in the banks, and if such reports had stated the true condition of affairs, showing the frequent and large expenditures at a time when the company was practically dormant and a depleted balance in the banks, that, of course, would have been notice to the directors that something was wrong and required their prompt attention. If the treasurer's reports had shown that there was on deposit in the banks the moneys which should have been there the mere inquiry at the bank would have verified such report. The accountants employed to examine the financial affairs of the corporation would have had the benefit of such reports and by visiting the banks could have checked up the reports as to the balance remaining on deposit. These reports would also have disclosed the large amounts expended during the period of Clarke's defalcations when the company was practically dormant, as compared with the smaller expenditures during the previous years when the company was actively engaged in business. A comparison of these items of expenditure would have at once aroused suspicion that all was not as it should be. We have not, as I say, the benefit of many of the reports of these accountants during the period when these misappropriations were occurring, and, therefore, are unable to discover whether the reports were of sufficient particularity to inform the directors to any degree as to the true condition of the corporation's affairs. If those reports should show that the accountants made no effort to ascertain

or compare the expenditures of the corporation at the time when said misappropriations were carried on as compared with former years, and if it should appear that the accountants neither ascertained nor reported to the corporation the condition of its bank account, then the employment of such accountants would furnish little protection to the corporation, and furnish slight excuse for the failure of the directors to inform themselves of the true condition of the corporation's affairs. It seems to me that common prudence on the part of the directors would have advised them of the fact that the expenditures of the corporation, as evidenced by the frequent and considerable withdrawals made by this treasurer, were out of all proportion as compared with those of corresponding periods in previous years, and that the easily ascertainable fact that the expenditures were far greater during the years of inactivity, when Clarke carried on his defalcations, than in the years when the company was actively engaged in operations, should have aroused their suspicions. It also seems to me that common prudence should have prompted the directors to ascertain and know the condition of their bank account at all times. As it was, the reports of the accountants directed the attention of the directors to the fact that expenditures were being made upon vouchers not properly approved, and that the treasurer was overdrawing his salary allowance. These facts alone should have caused the directors to inquire more closely into the affairs of the corporation in their charge. It was negligence on their part to ignore such warning. The treasurer of the company had started with the plaintiff corporation as a stenographer, and had grown up with the business, and had been a trusted employee for many years, and it is quite apparent that the directors relied implicitly on his honesty. This, however, furnishes little excuse when a very slight attention to the affairs of their concern and the insistence that the treasurer make the reports monthly that the by-laws called for, would surely have uncovered the dishonest practices which were going on.

While, as before suggested, defendants may be excused from discovering the dishonesty of plaintiff's treasurer while

the corporation was active, and that as to the eight items of theft represented by the withdrawals from the Chatham and Phenix National Bank prior to June 21, 1913, aggregating the sum of $8,979.08, the defendants should not be held responsible, as to the other nineteen items, aggregating $22,797.59, I think the evidence is sufficient to charge the defendants with negligence, and that as to such items the plaintiff is entitled to recover of them the amount of its losses. As directors, they were bound to use the same degree of care and vigilance in the performance of their duties as a reasonably prudent and careful man· would use in the conduct of his business. (*General Rubber Co.* v. *Benedict,* 215 N. Y. 18; *Childs* v. *White,* 158 App. Div. 1; *Hun* v. *Cary,* 82 N. Y. 65; *Bosworth* v. *Allen,* 168 id. 157.)

These defalcations from which the plaintiff has suffered occurred through the dishonesty of an agent appointed by the defendant directors. The law is well settled that when such defalcations could have been detected and prevented by the exercise of ordinary care and vigilance on the part of the directors they are personally liable for loss sustained by reason of their negligence. (*Brinckerhoff* v. *Bostwick,* 88 N. Y. 52; *Higgins* v. *Tefft,* 4 App. Div. 62.)

The judgment and order appealed from should be reversed and a new trial granted, with costs to appellants to abide the event, unless plaintiff stipulates to reduce the recovery to an amount represented by the defalcations of its treasurer on and after November 11, 1913, including interest; in which event the judgment as so modified and the order appealed from are affirmed, with costs to the respondent.

CLARKE, P. J., LAUGHLIN, PAGE and SHEARN, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellants to abide event, unless plaintiff stipulates to reduce recovery as indicated in opinion; in which event the judgment as so modified and the order appealed from are affirmed, with costs to respondent. Order to be settled on notice.