WILLIAM J. WINTER, Appellant, *v.* JAMES H. ANDERSON and Others, Respondents.

Fourth Department, November 21, 1934.

*Michael H. Cahill* and *William F. Tanner*, for the appellant.

*Lyman M. Bass* [*Daniel J. Kenefick* of counsel], for the respondents James H. Anderson and others.

*R. G. Hunt*, for the respondent Floyd L. Carlisle.

EDGCOMB, J. This is a representative action, brought by the plaintiff, a minority stockholder in the Niagara Share Corporation of Maryland, on his own behalf, and for the benefit of other stockholders of said corporation, against the defendants, who are officers, directors and majority stockholders thereof, to recover the damages occasioned by the alleged official misconduct of the individual defendants. The action was tried in equity, and resulted in a judgment dismissing the complaint. Plaintiff appeals.

The Niagara Share Corporation of Maryland was incorporated in June, 1929, with an authorized capital of $10,000,000, consisting

of 1,000,000 shares of common stock of the par value of $10 each. The capital structure was changed from time to time, so that ultimately there was an authorized issue of 50,000 shares of class A preferred stock of a par value of $100 each, and 4,000,000 shares of common stock of the par value of $5 per share. It is a holding company, and is engaged in the purchase and sale of securities of all kinds. On January 10, 1930, it acquired all the assets of the Niagara Share Corporation of Delaware. This sale was duly ratified and approved by the stockholders of both companies. Thereafter, and from time to time, the Maryland corporation bought various securities, several of which purchases are now attacked by the plaintiff as being conducted and consummated in fraud and bad faith, and as resulting in waste and loss to the defendant corporation.

Before discussing the facts, it may be well to briefly refer to the duty which the individual defendants owed to their corporation. The rule is well settled that the officers and directors of a corporation occupy positions of trust in relation to their company and to its stockholders, and in all their dealings are bound to act with fidelity and in the utmost good faith; they are required to guard and care for the property of the corporation, and to manage its affairs with the same degree of loyalty and devotion that men of average prudence apply to their own personal affairs; they must subordinate their individual and private interests to their duty to the corporation whenever the two conflict. For the violation of such duty, resulting in loss and waste of the corporate assets, they may be made to account in equity to the corporation or to its representatives. (*Bosworth* v. *Allen*, 168 N. Y. 157, 165, 166; *General Rubber Co.* v. *Benedict*, 215 id. 18; *Tri-Bullion Smelting & Development Co.* v. *Corliss*, 186 App. Div. 613, 626; affd., 230 N. Y. 629; *Billings* v. *Shaw*, 209 id. 265, 279; *Jacobson* v. *Brooklyn Lumber Co.*, 184 id. 152, 162.)

A corporate officer or director is not permitted to derive any personal profit or advantage by reason of his position, which is not enjoyed in common by all the stockholders. (*McClure* v. *Law*, 161 N. Y. 78, 81; *Blake* v. *Buffalo Creek R. R. Co.*, 56 id. 485, 491; *Pollitz* v. *Wabash R. R. Co.*, 207 id. 113, 124.)

Plaintiff insists that these familiar rules, which are based on morality and sound public policy, were violated by the defendants in seven separate transactions, resulting in a loss to the corporation of $66,545,105.19.

Throughout this discussion it must constantly be borne in mind that this rule of liability is limited to the fraudulent, dishonest or collusive acts of the officers or directors, which result in loss to the

corporation, and cannot be invoked for a mere error of judgment, or lack of efficiency upon their part. Power and authority in the directors to manage and conduct the affairs of the corporation are absolute, so long as they act in accordance with their best judgment and, in the absence of a dishonest purpose, or of fraud, bad faith or negligence so gross as to amount to a breach of trust, their discretion will not be reviewed by the court in an action attacking their conduct. (*Schwab* v. *Potter Co.*, 194 N. Y. 409; *Pollitz* v. *Wabash R. R. Co.*, 207 id. 113, 124; *Leslie* v. *Lorillard*, 110 id. 519, 532; *Liebman* v. *Auto Strop Co.*, 241 id. 427, 433, 434; *Colby* v. *Equitable Trust Co.*, 124 App. Div. 262, 267; affd., 192 N. Y. 535; *City Bank Farmers Trust Co.* v. *Hewitt Realty Co.*, 257 id. 62, 67; *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 id. 185, 193; *Gamble* v. *Queens County Water Co.*, 123 id. 91, 99.)

Upon this subject, listen to the rule as stated by Judge COLLIN in *Pollitz* v. *Wabash R. R. Co.* (207 N. Y. at p. 124): " Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient."

The rule is also succinctly stated in the following language by Judge GRAY in *Leslie* v. *Lorillard* (110 N. Y. at p. 532): " In actions by stockholders, which assail the acts of their directors or trustees, courts will not interfere unless the powers have been illegally or unconscientiously executed, or unless it be made to appear that the acts were fraudulent or collusive and destructive of the rights of the stockholders. Mere errors of judgment are not sufficient as grounds for equity interference; for the powers of those entrusted with corporate management are largely discretionary."

To properly present the questions raised upon this appeal, it will be necessary to refer in considerable detail to the various transactions complained of, although to do so will greatly prolong this opinion.

The first transaction which is attacked by the plaintiff relates to the payment by the Niagara Share Company of Maryland of bonds of the Schoellkopf Securities Corporation of the aggregate par value of $366,000.

This latter corporation was distinctly a Schoellkopf family affair. At the time of its incorporation in 1910 its stock was entirely owned by the Schoellkopf family. It was organized to hold certain assets of the estate of Jacob F. Schoellkopf, the grandfather of the defendant Jacob F. Schoellkopf, Jr., which could not easily be distributed to the heirs.

The Niagara Share Corporation of Delaware, prior to its merger with the Maryland corporation, acquired all the assets of the Schoellkopf Securities Corporation, and assumed all of its outstanding liabilities, including an issue of bonds of the par value of $366,000, due in 1946, and which had been sold to the public. The Maryland corporation, at the time it took over the assets of the Delaware corporation, assumed the payment of these obligations. The bonds were called, and were paid by the Maryland corporation in 1930.

Plaintiff asserts that there was no consideration accruing to the Maryland corporation for its assumption and payment of these bonds, and that its purpose was solely to benefit the Schoellkopf family.

So far as consideration is concerned, the liability of the Schoellkopf Securities Corporation on these obligations was deducted in determining the net worth of its assets, and the amount which the Delaware corporation was to pay for its stock. There was no secret profit to any of the individual defendants. None of them owned any of these debentures, or had any financial interest in their payment. In the exchange of the stock of the Delaware corporation for that of the Maryland corporation, no member of the Schoellkopf family received any better or more preferential treatment than any other stockholder.

I find no proof of fraud, bad faith or illegality in this transaction.

The next matter to which the plaintiff calls our attention is the acquisition by the Niagara Share Corporation of Maryland of the stock of Schoellkopf, Hutton & Pomeroy, Inc., a corporation doing business in the city of Buffalo, N. Y., and engaged in underwriting, buying, selling and dealing in securities of various kinds. In August, 1930, the share corporation purchased from Schoellkopf, Hutton & Pomeroy Securities Corporation, the then owner, the entire capital stock of Schoellkopf, Hutton & Pomeroy, Inc., consisting of 30,000 shares of the par value of $100 each, and in payment thereof transferred and delivered 958,171 shares of its own common stock to the securities corporation. No money was paid by either party to the other. It was simply an exchange of the stock of two corporations engaged in the same line of business. To make up this 958,171 shares of its stock, the Maryland corporation used 296,171 shares then in its treasury, and issued 662,000 additional shares which had never before been issued.

When Schoellkopf, Hutton & Pomeroy, Inc., was incorporated in 1919 its entire capital stock was owned by the Seeheim Corporation. That was so down to August 8, 1930. The Seeheim Corporation was a holding company, and was organized in 1913. Its stock was owned by Jacob F. Schoellkopf, Jr., and his two sisters, Ruth S. Phillips and Esther S. Kramer, in equal amounts.

The defendants Jacob F. Schoellkopf, Jr., and Russell Hutton were officers and directors of Schoellkopf, Hutton & Pomeroy, Inc., and they, together with Horace B. Pomeroy and Charles G. Terry, had active charge and management of its affairs.

In 1930 the Schoellkopf, Hutton & Pomeroy Securities Corporation was incorporated for the purpose of taking over from the Seeheim Company the stock of Schoellkopf, Hutton & Pomeroy, Inc., and giving to the men who had been active in its management a financial interest in its earnings, and thus assure their continuance with the concern.

The capital stock of the securities corporation consisted of 9,582 shares, and was issued to the Seeheim Company and to the officers, directors and employees of Schoellkopf, Hutton & Pomeroy as follows: Seeheim Corporation, 6,182 shares; J. F. Schoellkopf, Jr., 1,370 shares; R. J. H. Hutton, 1,150 shares; Horace B. Pomeroy, 600 shares; Charles G. Terry, 154 shares; Merritt M. Long, 42 shares; Fay H. Battey, 42 shares, and Harold H. Rockwood, 42 shares. Each of these subscribers paid five dollars per share for their stock. In addition, the Seeheim Corporation transferred and delivered to the new concern, as a contribution to its paid-in surplus, the 30,000 shares of capital stock of Schoellkopf, Hutton & Pomeroy, Inc. In this manner Schoellkopf, Hutton & Pomeroy Securities Corporation came into the picture, and, being the owner of the stock which the share corporation wished to purchase, became the party with which the prospective purchaser had to deal.

Plaintiff points the finger of suspicion at this entire transaction because of its complexity and the interlocking activities of these various corporations in which certain of these defendants were interested, and the somewhat circuitous route taken to bring about the final acquisition of this stock. It must be remembered, however, that mere suspicion does not constitute fraud. Fraud is never presumed; it must be proven. There is nothing illegal about the procedure followed here, if these defendants acted in good faith, and were motivated by an honest purpose.

The trial court has found that the directors of the Niagara Share Corporation used their honest and unbiased judgment in relation to this transaction, and that the stocks of the two corporations as exchanged were substantially of equal value. There is ample evidence to uphold such a finding.

Schoellkopf, Hutton & Pomeroy was a successful going concern. Its net capital and surplus on June 30, 1930, had a market value of $5,878,393.67. Its average annual earnings for the five years ending December 31, 1929, were $1,030,499.93, and for the six months ending June 30, 1930, it had earned $541,112.73. Such an earning

power was in excess of one dollar per share on 958,171 shares of the common stock of the Maryland corporation. The annual net earnings of the share corporation were at the rate of approximately sixty cents a share on its common stock then outstanding, which earnings were equivalent to approximately $575,000 per annum on 958,171 such shares. Viewed from an earning standpoint, if there was no change in the future, the Niagara Share Corporation would seem to have the best of the bargain.

One buying stock is always interested in its earning power, and its actual value is largely dependent upon what dividends it pays. Its book value is important, but by no means controlling. The balance sheet throws but little light on what the concern will earn. A competent sales department, and efficient and active managers go a long way to make any business a success.

In determining the value of the respective stocks which were exchanged on this occasion, it was very proper that the earning power of the two corporations should play an important part. (*Colby* v. *Equitable Trust Co.*, 124 App. Div. 262, 269, 270; affd., 192 N. Y. 535.)

In making this exchange of stock, the Niagara Share Corporation took the precaution to make sure that the services of the men who had been associated with Schoellkopf, Hutton & Pomeroy, Inc., in the past, and who had made that concern a success, were assured to the corporation in the future. All of these men terminated and canceled their existing contracts of employment, and made new agreements to continue in the service of the corporation for the succeeding five years, at a fixed salary, or on a definite commission basis. The salaries of Jacob F. Schoellkopf, Jr., and Russell Hutton were fixed at a considerably less sum than they were receiving under their former contract. All this inured to the benefit of the share corporation, and shows good faith and honest dealing on the part of these two men, rather than fraud or a desire to unduly enrich themselves at the expense of the other directors of the share corporation.

In view of the actual assets of the corporation, and of its good will and its earning capacity, and of the potential value of the contract assuring to Schoellkopf, Hutton & Pomeroy the services of its old officers and employees for five years, the directors of the share corporation fixed the value of its common stock, which it gave in exchange for the Schoellkopf, Hutton & Pomeroy stock, at fifteen dollars per share. If that was a correct estimate, the issue of 662,000 shares of unissued common stock with which to pay for the property purchased was for an amount not less than the par value of such shares, as was required by section 69 of the Stock Corporation

Law, and the sale of the 296,171 shares of treasury stock cannot be criticised. The directors of the share corporation were the judges of the value of the property which they were purchasing, and, in the absence of bad faith or of a dishonest purpose on their part, their discretion in fixing its value cannot be questioned. (Stock Corp. Law, § 69; *Schenck* v. *Andrews,* 57 N. Y. 133.) There is no evidence here from which we can say that their judgment was influenced by selfish or improper motives.

This transaction was not consummated in the dark, or without due consideration upon the part of the Niagara Share Corporation. Its advisability, from the standpoint of the Maryland corporation, was thoroughly considered and investigated by a committee of its board of directors, none of whom was in any way interested in Schoellkopf, Hutton & Pomeroy. The committee recommended the trade, and their report was unanimously adopted by the board of directors, and the officers of the corporation were authorized to take the necessary steps to carry out the transfer of the stock. Messrs. J. F. Schoellkopf, Jr., and Hutton withdrew from the meeting, and took no part in the proceedings, so far as this matter was concerned.

The trial court has found that the transaction was fairly and openly conducted, and that the share corporation was adequately represented in the transaction by directors and officers in no way connected with Schoellkopf, Hutton & Pomeroy, and that neither Jacob F. Schoellkopf, Jr., nor Russell Hutton influenced or controlled any other director or officer of the share corporation in respect to the transaction. We find no evidence which would warrant a contrary finding.

The stockholders of the share corporation were informed of what had been done. At the annual meeting held in Baltimore on May 13, 1931, at which there were present fifty-five and six-tenths per cent of the holders of the preferred stock, and seventy-eight and six-tenths per cent of the holders of the common stock issued and outstanding, the minute books of the corporation, containing the minutes of all meetings of the board of directors and of the executive committee thereof since the last annual meeting in the preceding May, including the meeting of the board of directors at which the report of the committee appointed to investigate the transaction in question was presented and at which the action in relation thereto was taken, were opened for examination by the stockholders, and it was announced that the chairman would answer any inquiry in relation thereto. A resolution was unanimously adopted ratifying, confirming and approving all the purchases, sales, contracts, acts and proceedings of the board of directors of

the corporation as disclosed in the books and records presented. It does not appear whether the plaintiff was present person or by proxy at said meeting, but all stockholders had notice thereof.

Plaintiff in his brief asserts that the Niagara Share Corporation was cheated out of $9,700,000, an item included in the 1930 balance sheet of Schoellkopf, Hutton & Pomeroy for good will, and the further sum of $4,298,052, an amount which it is alleged the Niagara Share Corporation paid for certain assets of Schoellkopf, Hutton & Pomeroy in addition to the 958,171 shares of its own stock.

It appears that the balance sheet of Schoellkopf, Hutton & Pomeroy, Inc., as of August 31, 1929, just after that company was acquired by the share corporation, shows assets of $21,145,-869.90, and that the balance sheet of the following year states the assets to be $15,912,829.83, a difference of $5,233,040.07. Plaintiff asserts that the only logical conclusion which can be drawn from these facts is that a serious loss had taken place in the short space of one year. Not so, however. The true financial condition of a corporation is not revealed by examining but one side of the balance sheet. It can only be determined by scanning both the assets and the liabilities. The net worth of a corporation, rather than its gross assets, is what counts. The accounts payable, as shown on the 1930 balance sheet, amounted to $532,788.49 as against $9,788,-523.28 in 1929, and the notes payable in 1930 were only $350,000 as compared with $5,501,841.94 in 1929. This difference can only be accounted for by the payment of the company's obligations from its property on hand.

Plaintiff further says that, in order to swell the assets to $15,912,-829.83, the 1930 balance sheet contains an item of $9,700,000 for good will, which did not appear in the 1929 balance sheet, and that the actual value of the assets in 1930 was $6,212,829.83 instead of $15,912,829.83, and the actual loss during the year was $14,933,-040.07 instead of $5,233,040.07. There was no such actual loss. The current liabilities of the company had been reduced during the year ending August 31, 1930, from $15,490,365.22 to $884,069.38, and the surplus account had been increased $10,164,268.93 in 1930 over that of the previous year. It is the net result in which we are interested.

We find no legal liability on the part of these defendants or of any of them so far as this transaction is concerned.

Attention is now directed to the purchase in 1931 of the capital stock of the Pompeian Company for $1,000,000, a price which plaintiff says was excessive, exorbitant and fictitious, and which transaction, it is claimed, resulted in a secret profit to the defendant J. F. Schoellkopf, Jr.

The Pompeian Company is a New Jersey corporation, and owns patents, processes, trade-marks, etc., for the manufacture of the so-called Pompeian brand of cold creams and other cosmetics. Its stock was owned by the Colgate-Palmolive-Peet Company. It was operating a plant in Bloomfield, N. J., for the manufacture of its products. It was a successful concern, as is shown by the amount of its net sales, which amounted to $2,122,255.04 for the year ending December 31, 1928, and to $1,672,066.82 for the preceding year. Its net profits for 1928 were $220,040, and for 1929 they amounted to $570,382.39. Its current assets as of March 31, 1933, were $534,000, of which $342,000 was cash.

On January 27, 1930, a contract was entered into by Jacob F. Schoellkopf, Jr., Harold F. Ritchie and Floyd M. Shoemaker, whereby the three agreed to offer the Colgate-Palmolive-Peet Company a sum not to exceed $1,750,000 for the entire capital stock and assets of the Pompeian Company, and, if the offer was accepted and the sale consummated, it was agreed that twenty-seven and one-half per cent of the stock should be issued to Harold F. Ritchie, twenty-seven and one-half per cent to Floyd M. Shoemaker, and forty-five per cent to J. F. Schoellkopf, Jr.

In making this contract, Jacob F. Schoellkopf, Jr., was acting for and on behalf of the Niagara Share Corporation, and he subsequently assigned all his right, title and interest in the agreement to that corporation upon its assuming his obligations thereunder. This was done pursuant to an authorization of the directors of the corporation. When it came to making the purchase, the stock of the Pompeian Company was bought for $1,600,000, and $400,000 was contributed for working capital. Of this $2,000,000 Ritchie paid $312,500, Shoemaker paid $312,500, and the Niagara Share Corporation of Maryland paid the balance. It will thus be noted that the Maryland corporation paid $1,375,000 for a forty-five per cent share in the Pompeian Company, while Shoemaker and Ritchie paid $625,000 for a fifty-five per cent interest. This, the plaintiff asserts, was unjust and unfair to the share corporation, and stamps the entire transaction as fraudulent and collusive.

Mr. Schoellkopf, of whose actions plaintiff complains, did not profit personally because the Niagara Share Corporation paid $750,000 more for a forty-five per cent interest than Ritchie and Shoemaker paid for a ten per cent greater share. No motive is apparent for paying large sums out of the corporation's treasury merely to enrich Ritchie and Shoemaker.

This arrangement may have been poor business judgment, but with that we are not interested. Had we been directors we might have balked at this distribution. But that is of no importance

here. The management of stock corporations is vested in its board of directors, and not in the courts.

Mr. Ritchie was not only the president of one of the largest organizations in the world for the sale of proprietary toilet articles and medications, but he held a controlling interest therein. With his influence an adequate sales organization was instantly at hand for the sale of the Pompeian products. Mr. Shoemaker was engaged in the manufacture of proprietary articles, and both he and Ritchie were thoroughly familiar with the trade. It is claimed, and the assertion is not without some basis, that the experience of these two men was worth the difference in the price which they paid for the stock of the Pompeian Company and that paid by the Niagara Share Corporation.

One can scarcely refrain from suggesting, however, that, if the knowledge and experience of Ritchie and Shoemaker were so very valuable, it would have been good business judgment to tie them up for a term of years by a contract. That suggestion, however, is mere idle curiosity, as it has no bearing upon our decision, so long as there was no fraud or bad faith on the part of Mr. Schoellkopf.

The directors desired to limit the commitment of the share corporation to $1,000,000, and in order to do so authorized the president to accept such participations in that part of the financing of the Pompeian Company as he, in his judgment, deemed desirable. Pursuant to such authority Mr. Schoellkopf, the president, secured participations in that part of the purchase of the Pompeian stock underwritten by the share corporation from responsible third persons to the extent of $375,000. The participations provided that the share corporation should pay the full amount of its original commitment, and that the participants should pay to the corporation the principal amount of their respective participations upon demand, and in the meantime they should pay interest thereon at the rate of six per cent per annum, and that the share corporation should retain, as collateral security for the payment of such principal and interest, the stock of the Pompeian Company to which such participants would be entitled. Each of the defendant participants has promptly paid the interest on the amount of his participation. No demand has been made for the principal. The trial court has found that each of said participants is financially responsible for the amount of his participation. Under these circumstances, it is difficult to see how the share corporation has been defrauded.

So far as the record discloses, we fail to find anything in this whole transaction which shows any undue enrichment on the part of an officer or director of the Niagara Share Corporation, or any fraud

or dishonest act on their part. It was an ordinary business transaction. There was no interlocking directorate in the dealing concerns, and none of the officers or directors of the Maryland corporation had any interest in either the Pompeian Company or the Colgate-Palmolive-Peet Corporation. The court will not review or question the discretion of the directors under the circumstances disclosed here.

We now come to a consideration of appellant's assertion that loans aggregating $8,280,000, none of which has as yet been repaid, were improperly made to the Niagara Oil Corporation by the Niagara Share Corporation of Maryland and its predecessor, the Delaware corporation.

The Niagara Oil Corporation was organized in 1929 for the purpose of purchasing and developing oil properties in the so-called " Bradford Field " in McKean county, Penn., and elsewhere. Its entire capital stock was owned equally by the Forest Oil Corporation and the Niagara Share Corporation of Delaware.

The Delaware corporation had agreed to loan the Niagara Oil Corporation $4,500,000 for acquisition and development purposes, and the Forest Oil Corporation agreed to guarantee fifty per cent of such indebtedness. Pursuant to such arrangement, the Delaware corporation from time to time loaned the Niagara Oil Corporation $1,700,000. Among the assets acquired by the Niagara Share Corporation of Maryland, when it took over the Delaware corporation and assumed its liabilities, was one-half of the capital stock of the Niagara Oil Corporation, and among the liabilities was the obligation to make additional loans to that corporation up to $2,800,000. The Maryland Share Corporation had, therefore, a vital interest in the success of the oil company, and every incentive to do everything in its power, which it could reasonably and properly do, to aid in bringing about that success.

Other contracts were made from time to time by the Maryland Share Corporation to lend additional sums to the Niagara Oil Company, the Forest Oil Corporation agreeing each time to guarantee fifty per cent of the loan. Under these agreements the total indebtedness of the Niagara Oil Company has reached the sum of $8,280,000, fifty per cent of which has been guaranteed by the Forest Oil Corporation. The net worth of the latter corporation is approximately $6,000,000. Interest upon the loan has been promptly paid as it became due.

None of the individual defendants ever had any personal financial interest in either the Niagara Oil Corporation or the Forest Oil Corporation.

The Niagara Oil Corporation has been under the active management of Forest D. Dorn and Raymond J. Brennan, who were among the pioneers in the method of producing oil by the flooding process in the Bradford field, and who were thoroughly familiar with that field. By this method twenty per cent of the total original oil deposit is recovered.

The Niagara Oil Corporation owns 7,000 acres of oil-producing properties in the Bradford field. On August 31, 1933, it had 1,559 oil-producing wells. The Bradford oil is said to be the highest grade produced anywhere for lubricating purposes, and commands a higher price than any other oil. When the corporation began operations, the market price of this oil was four dollars and thirty-five cents a barrel. Thereafter, there was a steady and continuous decline from the peak of four dollars and thirty-five cents a barrel to one dollar and twenty-seven cents a barrel in May, 1933, which was the lowest price recorded in twenty years. In October, 1933, the price had risen to two dollars and forty-five cents a barrel. There is a ready market for all oil produced. From the time of its organization to August 31, 1933, the corporation produced approximately 1,800,000 barrels of oil, and the estimated amount still recoverable under the flooding process is 25,000,000 barrels. At the market price in October, 1933, that would amount to over $60,000,000.

In May, 1930, the corporation was getting approximately 800 barrels a day, at which time, on account of business conditions and overproduction, the producers were limited to fifty per cent of the amount produced on May 1, 1930. This proration continued, with occasional privileges to increase production, until May, 1933, at which time prorating was discontinued. On the latter date the corporation was producing 1,600 barrels per day, and in October, 1933, had increased the daily yield to 2,600 barrels.

The accumulated operating deficit down to August 31, 1933, was approximately $4,000,000. Of this amount approximately $1,500,000 represented the cost of drilling wells, which has been charged to expense, although properly a capital charge, or at least partially so. The remainder of the deficit is attributable to expenses incurred before oil production was achieved, and to the steady decline in price and the limitation of production. The corporation has at all times paid its current obligations as they became due, and its current assets exceed its current liabilities. Its original mortgage liability of $7,800,000 has been reduced to approximately $4,000,000.

The plaintiff argues that the defendants in loaning $8,280,000 of the funds of the Maryland corporation to the Niagara Oil Corporation " with full knowledge of its weakened and insolvent con-

dition, wilfully, deliberately and negligently violated the law of this State, and their duties and obligations as trustees, and thereby wasted the funds of the corporation and the shareholders thereof.''

This argument is based upon the proposition that, during the period when these loans were made, the Niagara Oil Corporation was insolvent to the knowledge of the defendants. The court has found to the contrary, and there is ample evidence to sustain the finding. If the oil company was solvent, the loaning of this money, under the circumstances disclosed by the record, could scarcely be said to be poor judgment, much less could it be claimed to constitute fraud on the part of the defendants.

One more transaction remains to be discussed, viz., the acquisition of a substantial holding of the common stock of the Buffalo, Niagara and Eastern Power Corporation, which was later exchanged for securities of the Niagara and Hudson Power Corporation. Appellant asserts in his brief that this transaction was carried out for the particular benefit of the Schoellkopf family, and their immediate business associates.

The testimony shows that at one time the Bennie Securities Corporation owned virtually all of the stock of the Buffalo, Niagara and Eastern Power Corporation, which at one time or another had belonged to the members of the Schoellkopf family. That stock was exchanged for stock in the Niagara Share Corporation of Maryland. Still later, the stock was exchanged by the Maryland corporation for stock of the Niagara and Hudson Power Corporation. All of the Niagara and Hudson Power stock, or its previous entities, which formerly belonged to the Schoellkopf family, is now represented by stock of the Niagara Share Corporation of Maryland.

Plaintiff calls our attention to a letter written to the stockholders of the Maryland corporation by its president, J. F. Schoellkopf, Jr., in which he states, among other things, that in June, 1929, the Maryland corporation acquired, by the issuance of its capital stock, a substantial holding of common and class A stocks of the Buffalo, Niagara and Eastern Power Corporation, later exchanged for securities of the Niagara and Hudson Power Corporation. The letter further states: '' The portfolio shows a substantial depreciation as of December 31, 1929, as compared with book cost. This is accounted for largely by the fact that the recorded cost of Niagara Hudson Power Corporation common stock and class A warrants, acquired in the manner above related, was based upon the market value of such securities at the time of acquisition, several months prior to the general market depression. Your directors have ordered a segregation of a capital surplus reserve in the amount of $43,302,683.86, representing the difference between the market

value at the time of acquisition of securities acquired, and the par value of Niagara Share Corporation of Maryland common stock issued therefor."

No other testimony or exhibit is called to our attention with respect to this transaction. It seems to me that the plaintiff falls far short of establishing any fraudulent dealing in Niagara and Hudson Power stock to the disadvantage of the stockholders of the share corporation. The exchange of Buffalo, Niagara and Eastern Power Corporation stock for that of Niagara and Hudson Power Corporation stock was effected upon the same basis as similar exchanges made by all the other stockholders of Buffalo, Niagara and Eastern Power Corporation. The claim of the plaintiff that the Maryland corporation lost $43,302,683.86 as a result of acquiring the Niagara and Hudson Power stock is not supported by the facts. This item is a transfer of that amount from paid in surplus to capital reserve surplus. The net asset worth of the corporation is in no way changed by this bookkeeping entry.

Alleged losses connected with the purchase by the Niagara Share Corporation of bonds of the United States Daily Publishing Corporation, amounting to $79,250, and of the Ford Hotels Company, Inc., aggregating $350,000, are set forth in the complaint, but no mention of these transactions is made by plaintiff in his brief. I refrain, therefore, from any discussion of these matters. I have, however, carefully examined the evidence relating to these transactions, and find no evidence of fraud or bad faith on the part of the defendants or any of them.

The discussion already had covers in general all the points raised by the plaintiff in his brief and on the oral argument of the appeal. Plaintiff does not complain of any error in the admission or rejection of evidence, or of any prejudicial occurrence which happened during the trial. In his brief and on his oral argument appellant seeks to reverse the judgment appealed from solely upon the ground that the trial court erred in not finding that the evidence sustains the allegations of his complaint, and that it conclusively establishes the liability of the defendants for the damages sustained by the corporation and its stockholders, as the result of defendants' alleged fraud, gross negligence and illegal acts.

The findings fully sustain the judgment appealed from, and there is ample evidence to sustain the findings. The judgment, therefore, must be affirmed.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and LEWIS, JJ.

Judgment affirmed, with costs.