DOUGLAS O. ROBERTSON, Suing for Himself as Stockholder and All Other Stockholders of the MARINE TRANSIT CORPORATION in Like Situation, Plaintiff, *v.* JOHN D. SCHOONMAKER, GERALD A. FAGAN and Others, Defendants.

Supreme Court, Special Term, Queens County, November 2, 1935.

*Perry A. Hull* [*Vahan Kalenderian* of counsel], for the plaintiff.

*Otto & Easterday* [*Henry E. Otto, Samuel C. Otto* and *Edmond B. Butler* of counsel], for the cross-complainant, Gerald A. Fagan.

*Dugan & Bookstein* [*Isadore Bookstein* of counsel], for John D. Schoonmaker's executors.

*Russell C. Gay*, for John I. Kinney, Romer B. Markle, Edgar P. Deane, John D. Schoonmaker, Jr., Rome Transit Corporation, Kingston Shipyards, Inc., and Kingston Dry Dock & Construction Co., Inc.

*Gardiner Conroy*, for the Sidco Corporation, Fagco Corporation, Craco Corporation, Chico Corporation, Empco Corporation, Steco Corporation, Barge Corporation, General Marine Transit Co., Inc., and Marine Transit Corporation.

*Gardiner Conroy* [*Russell C. Gay* of counsel], for Courtland Palmer, Joseph M. Lovelace and Therese Damberger.

*Howard Osterhout*, for the National Motorship Corporation.

*Wiswall, Walton, Wood & MacAffer* [*Kenneth S. MacAffer* of counsel], for Charles W. Walton and Kingston Trust Company.

STEINBRINK, J. Plaintiff sues in a representative capacity as minority stockholder in the Marine Transit Corporation in his own behalf and for the benefit of other stockholders of the said corporation, charging the individual defendants, who are the officers and directors either of the said corporation or of related corporations, with alleged acts of official misconduct. He seeks, besides an accounting and injunctive relief, an assessment of damages. He is joined by the defendant Gerald A. Fagan who, both in his official capacity as stockholder in the National Motorship Corporation and as pledgor of stock with the defendant John D. Schoonmaker, pleads in his cross-complaint certain wrongful acts alleged to have been committed by the individual defendants in their official corporate and individual capacities.

Before discussing the nature of the issues, it will be necessary to outline the interrelation of the various corporations and the capacities in which the various individual defendants are claimed to have acted.

Marine Transit Corporation was incorporated on December 1, 1927, under the laws of the State of New York, as successor to Marine Transit Company. Both of these corporations were organized by the defendant John D. Schoonmaker, deceased, the defendant and cross-complainant, Gerald A. Fagan, and Arthur Connors, each of whom owned one-third of the stock. As time went on more stock was issued, and eventually Connors and Fagan each held 1,113 shares and Schoonmaker 1,114 shares. Connors disposed of his stock to Harry Shanks, who in turn sold them to the plaintiff in May, 1932. On July 30, 1932, and September 7, 1932, there were incorporated seven New Jersey corporations — Sidco Corporation, Fagco Corporation, Craco Corporation, Chico Corporation, Stecco Corporation, Emco Corporation and the Barge Corporation — and the stock of all was issued, ninety-eight per cent to the defendant Courtland Palmer, one per cent to his secretary, the defendant Damberger, and one per cent to his law office associate, the defendant Lovelace, all of whom became the officers and directors of these corporations. Marine Transit Corporation conveyed its twenty-four barges, some directly and others indirectly, to the Barge Corporation, and its six tugs, one to each of the other New Jersey corporations. In December of 1932, General Marine

Transit Company, Inc., was incorporated under the laws of the State of New York and its stock was issued, but not delivered, ninety-eight per cent to Schoonmaker, one per cent to Fagan, and one per cent to Palmer. A new certificate for all of the shares was subsequently issued and delivered to Marine Transit Corporation. For the year 1932 the New Jersey corporations chartered their barges and tugs to Marine Transit Corporation at specified charter rates, and the following year chartered them at the same rates to the newly organized General Marine Transit Company, Inc. During those two years the grain-carrying contracts were made by Rome Transit Corporation, a corporation wholly owned by Marine Transit Corporation. National Motorship Corporation, organized under the laws of the State of Delaware, acquired the Fagan and Schoonmaker interests in Marine Transit Corporation and all of the shares in Kingston Shipyards, Inc. It is sufficient at this time to note that Fagan was the record holder of one-third of the stock of National Motorship Corporation, and Schoonmaker the record holder of two-thirds of the stock. Kingston Dry Dock & Construction Company, Inc., was wholly owned by the Schoonmaker family. Some time in 1934 and after the commencement of this action, the fleet which had been transferred to the New Jersey corporations was retransferred to Marine Transit Corporation, and the stock in these corporations which had been held by Palmer and his employees was indorsed and delivered over to Marine Transit Corporation.

In addition to the corporations and individuals named, there are joined as defendants: John D. Schoonmaker, Jr., as his father's agent or representative under a power of attorney; Romer B. Markle and Edgar P. Deane, as employees and later officers and directors of Marine Transit Corporation; and John I. Kinney, as an employee of John D. Schoonmaker and certain of the corporations which he controlled, including Kingston Dry Dock & Construction Company, Inc., and Kingston Shipyards, Inc. During the course of the trial the complaint against the defendants Charles Walton and Kingston Trust Company was dismissed, without costs, on consent of both plaintiff and the cross-complainant.

### THE PLAINTIFF'S CAUSE OF ACTION.

The rules relating to actions of this nature are familiar.

" As a general rule courts have nothing to do with the internal management of business corporations. Whatever may lawfully be done by the directors or stockholders, acting through majorities prescribed by law, must of necessity be submitted to by the minority, for corporations can be conducted upon no other basis. All

questions within the scope of the corporate powers which relate to the policy of administration, to the expediency of proposed measures, or to the consideration of contracts, provided it is not·so grossly inadequate as to be evidence of fraud, are beyond the province of the courts. The minority directors or stockholders cannot come into court upon allegations of a want of judgment or lack of efficiency on the part of the majority and change the course of administration. Corporate elections furnish the only remedy for internal dissensions, as the majority must rule so long as it keeps within the powers conferred by the charter.

" To these general rules, however, there are some exceptions, and the most important is that founded on fraud. While courts cannot compel directors or stockholders, proceeding by the vote of a majority, to act wisely, they can compel them to act honestly, or undo their work if they act otherwise. Where a majority of the directors, or stockholders, or both, acting in bad faith, carry into effect a scheme which, even if lawful upon its face, is intended to circumvent the minority stockholders and defraud them out of their legal rights, the courts interfere and remedy the wrong. Action on the part of directors or stockholders, pursuant to a fraudulent scheme designed to injure the other stockholders, will sustain an action by the corporation, or, if it refuses to act, by a stockholder in its stead for the benefit of all the injured stockholders. (*Leslie* v. *Lorillard,* 110 N. Y. 519, 535; *Gamble* v. *Queens County Water Co.,* 123 N. Y. 91; *Sage* v. *Culver,* 147 N. Y. 245; *Farmers' Loan & Trust Co.* v. *N. Y. & N. Ry. Co.,* 150 N. Y. 410; *Hawes* v. *Oakland,* 104 U. S. 450.) " (*Flynn* v. *Brooklyn City R. R. Co.,* 158 N. Y. 493, 507.)

Judge GRAY, speaking for the court in *Leslie* v. *Lorillard* (110 N. Y. 519, 532), said: " In actions by stockholders, which assail the acts of their directors or trustees, courts will not interfere unless the powers have been illegally or unconscientiously executed, or unless it be made to appear that the acts were fraudulent or collusive and destructive of the rights of the stockholders. Mere errors of judgment are not sufficient as grounds for equity interference; for the powers of those entrusted with corporate management are largely discretionary." (See, also, *City Bank Farmers Trust Co.* v. *Hewitt Realty Co.,* 257 N. Y. 62, 68.)

More recently the rule was stated as follows: " The rule is well settled that the officers and directors of a corporation occupy positions of trust in relation to their company and to its stockholders, and in all their dealings are bound to act with fidelity and in the utmost good faith; they are required to guard and care for the property of the corporation, and to manage its affairs with the same

degree of loyalty and devotion that men of average prudence apply to their own personal affairs; they must subordinate their individual and private interests to their duty to the corporation whenever the two conflict. For the violation of such duty, resulting in loss and waste of the corporate assets, they may be made to account in equity to the corporation or to its representatives. (*Bosworth* v. *Allen*, 168 N. Y. 157, 165, 166; *General Rubber Co.* v. *Benedict*, 215 id. 18; *Tri-Bullion Smelting & Development Co.* v. *Corliss*, 186 App. Div. 613, 626; affd., 230 N. Y. 629; *Billings* v. *Shaw*, 209 id. 265, 279; *Jacobson* v. *Brooklyn Lumber Co.*, 184 id. 152, 162.) '' (*Winter* v. *Anderson*, 242 App. Div. 430, 431.)

The right of action belongs to the corporation, and in addition to showing that wrongful acts were committed, it is incumbent upon the plaintiff to prove that such acts damaged the corporation (*Waters* v. *Waters & Co.*, 201 N. Y. 184) unless the interposition of equity is sought to restrain a threatened act (*Schwab* v. *Potter Co.*, 194 N. Y. 409, 418, 419) or to undo what has been done. (*Murray* v. *Smith*, 166 App. Div. 528.)

The facts will be examined in the light of these rules.

1. The plaintiff charges that the transfer of the fleet to the New Jersey corporations was accomplished primarily for the purpose of preferring corporate obligations running to Schoonmaker, and secondarily for the purpose of defrauding creditors and ultimately forcing the sale of the vessels by burdening them with liens, mortgages and commitments in Schoonmaker's favor.

The facts with respect to the fleet transfer are as follows: As early as 1931, before the plaintiff became a stockholder in Marine Transit Corporation, Fagan was contemplating a plan whereby Marine Transit Corporation would divest itself of all physical assets. On March 4, 1932, Fagan, in a letter to Schoonmaker, suggested that the fleet be transferred to avoid difficulties arising out of the indemnity insurance situation. In his letter of July 9, 1932, Fagan outlined to Palmer the reason for the transfer of the fleet. To quote his own words: '' The purpose of these new corporations is to incorporate each of the tugs and several of the barges in separate companies. The Marine Transit Corporation will sell these tugs and barges to the respective companies for stock of the respective companies. The assets of the Marine Transit Corporation will not be impaired or otherwise changed, except, instead of having the equipment on our records as the visible property of tugs and barges, the property and equipment account will be substituted on our records in the same net amount covering the value of the stock acquired from the purchasing companies of the equipment.'' He wrote further: '' As you know as per our conversation, there are several claims

pending, the majority of which have been covered by insurance. When we call on the insurance companies to make payment to us, they have some reason or other to deny liability, and before we can commence action it is necessary in most cases, according to the terms of the policy, to make payment of the loss and await reimbursement from the Underwriters that may entail a suit against the Underwriters. The financial position at the present time of the Underwriters in some cases has been considerably depreciated between the date that we effected the insurance some years ago and the present date. Therefore, any liability that may be assessed against us in the form of a judgment will not tie up the equipment, in my opinion, but may tie up the stock that is owned by the Marine Transit Corporation, which will mean little or nothing."

Palmer, acting as attorney for Marine Transit Corporation, approved of the plan and proceeded to put it into effect. The plaintiff testified that on August 11, 1932, he attended a conference at which Fagan and Schoonmaker were present, and that he was told by Fagan that in order to obviate the harmful delays occasioned by the repeated seizure of vessels, their transfer into the new corporations was contemplated; that seven new corporations would be formed for that purpose; that the stock of these corporations would be issued to Marine Transit Corporation; and that as additional consideration these new corporations would assume certain of the liabilities of Marine Transit Corporation. At the close of the conference and at Fagan's request, the plaintiff signed a proxy " for the purpose of ratifying the act or acts of directors of the corporation in connection with the sale and transfer of some of the assets of the corporation." The retrospective language was used in view of the fact that some of the transfers had theretofore been effected. That the plaintiff was advised of this appears from his own testimony at the trial. He was asked by his counsel: " Did Mr. Fagan request you to sign a proxy to validate or authorize the transfers which he had described?" To which the plaintiff replied: " Yes, they asked me to sign a proxy." That the plaintiff was advised not only of the transfers but likewise of the motives which led to them prior to the execution of the proxy is not disputed. The plaintiff's complaint seems to be that while he approved of the plan in its general form, he was not told that the transfers would be made to New Jersey corporations or that the stock in these corporations would be issued in the name of Palmer and his employees. His complaint further seems to be that the only circumstance necessitating transfer of the fleet was the pressure being exerted by the Schoonmaker companies (Kingston Dry Dock & Construction Company, Inc., and Kingston Shipyards, Inc.) for payment of

Marine Transit Corporation obligations. This conclusion he predicates upon a series of transactions which he claims point to the real motive for the transfer-emasculation of Marine Transit Corporation for the personal benefit of Schoonmaker. Some of the facts relied upon invite no comment, for they obviously do not support the interpretation for which the plaintiff contends. Those upon which the plaintiff rests his case are singled out in his brief for special attention.

The plaintiff's claim that there was failure to disclose to him the use of New Jersey rather than domestic corporations and the issuance of the stock to Palmer and his employees, as trustees for Marine Transit Corporation, cannot be given very serious consideration. In view of the reasons disclosed to him for the transfers, he should have realized that little could have been accomplished if the relationship between the parent and the subsidiary corporations was apparent on the surface.

Since the plaintiff had expressly assented to the main features of the fleet transfer plan, he is estopped from asserting any claim with respect thereto, even though it be assumed that what was done was somehow *malum in se* or *malum prohibitum*. (*Little* v. *Garabrant*, 90 Hun, 404; affd., 153 N. Y. 661; *Continental Securities Co.* v. *Belmont*, 206 id. 7.) It appears further that as early as June 23, 1933, the plaintiff was told that the stock in the New Jersey corporations was held by Palmer. On August 2, 1933, Palmer offered to transfer to the plaintiff one-third of the stock if there was any complaint. Both the plaintiff and his attorney assured Palmer that he was right in taking the stock in his own name, since it served to protect the assets, stockholders and creditors of the corporation. That Palmer was not secretly holding the stock in the New Jersey corporations is best evidenced by his own notation in the stock certificate book under date of July 30, 1932, which reads as follows: " Affix stamps, July 30, 1932. Trust certificates. When transferred. No tax as no transfer of interest — C. P. 7 /30 /32." This notation was made simultaneously with issuance of the stock. Without clothing the transactions with judicial sanction or approval, it seems clear, nevertheless, that the entire plan was projected to help rather than to injure Marine Transit Corporation; that it was projected to provide a breathing spell for this ailing corporation so that it might liquidate its obligations while operating its fleet unhampered. If that actually was the motive, it serves to explain away many of the facts which standing alone may lend some credence to the plaintiff's claims. It must be noted that despite the transfer of the fleet, Marine Transit Corporation retained the beneficial ownership and that every penny derived from the fleet's

operation, less operating costs, was paid to or on account of Marine Transit Corporation. There is nothing in the record to show that any part of the revenue during the period that Palmer and his employees held the stock in trust for Marine Transit Corporation was wrongfully diverted to any of the companies either owned or controlled by Schoonmaker. Apart from the mortgages on barges given to Schoonmaker, to which reference will be made later, no vessel was conveyed either to Schoonmaker or to any of his companies.

It appears further that during the period in question a large sum of money was paid on account of Marine Transit Corporation in liquidation of obligations to its general creditors. It can hardly be said that these facts are consistent with a plan to confer some special benefit on Schoonmaker at the expense of the other stockholders and the creditors of Marine Transit Corporation. On the contrary, the record discloses that it was only through Schoonmaker's generosity that Marine Transit Corporation was enabled to continue in business. The plaintiff points to the "Capital Adjustments" of October 25, 1932, which recites that Marine Transit Corporation "does not owe the Kingston Shipyards, Inc., or Kingston Dry Dock & Construction Company any amounts for repairs" and that "Marine Transit Corporation is to be ultimately wound up and dissolved." Regardless of what this statement shows, the fact remains that Marine Transit Corporation retained beneficial ownership of the tugs and barges and was directly benefited by all revenue derived from operation of the fleet. There is nothing to indicate that the facts with regard to the contemplated dissolution of Marine Transit Corporation was designedly withheld from any one. Late in 1932 Fagan informed Palmer that because of outstanding judgments Marine Transit Corporation was experiencing considerable difficulties, and suggested that a new operating company called "General Marine," or some similar name, be formed. Palmer accordingly caused the General Marine Transit Company, Inc., to be organized. Anticipating objections by the Secretary of State to the use of the name "General Marine,' Marine Transit Corporation filed with the Secretary of State a certificate which recited in part as follows:

"Resolved that it is the judgment of this Board of Directors that the name General Marine Transit Co., Inc., will in no way or manner conflict with the name of this corporation, Marine Transit Corporation, for the reason that the General Marine Transit Co., Inc., will be used as a holding and chartering corporation for the transaction of business within the State of New York, in which it will not conflict with the business of the Marine Transit Corporation, which corporation is now in the process of liquidating and winding

up its affairs by paying its debts and collecting its outstanding assets and is not operating otherwise, and it is our further judgment that the said corporate names are sufficiently different and would not be calculated to deceive because of the nature of the business they do, and because of the common ownership of the stock."

The certificate of incorporation was dated October 26, 1932, and was filed in the office of the Secretary of State on December 30, 1932. One hundred shares of stock were issued, but not delivered; ninety-eight per cent to Schoonmaker, one per cent to Fagan, and one per cent to Palmer. The certificate to Schoonmaker was indorsed over to Marine Transit Corporation on January 31, 1934. Palmer assumed that he indorsed his certificate over at the same time. Thereafter, a certificate for the one hundred shares of General Marine Transit Company, Inc., was issued in the name of Marine Transit Corporation and dated back to December, 1932. No one, it appears, was deceived into the belief that the General Marine Transit Company, Inc., was anything but the operating company for Marine Transit Corporation. Not one penny of revenue derived from the operation of the fleet was improperly diverted from Marine Transit Corporation by reason of the use of this operating company. This is unlike a case where a corporation strips itself of all assets and is left an empty shell for, despite the plaintiff's characterizations, Marine Transit Corporation was at all times the beneficial owner of all of the General Marine Transit Company, Inc., stock and was deprived of nothing by the transaction. If the statement that Marine Transit Corporation " does not owe the Kingston Ship-yards, Inc., or Kingston Dry Dock & Construction Company any amounts for repairs " is at variance with the facts, that alone cannot serve to support either a charge of fraud or a charge of misfeasance, nor does it show damage to Marine Transit Corporation.

That the minutes of Marine Transit Corporation do not disclose any formal authorization for the organization of subsidiary corporations is of little significance in a corporation the stock of which is so closely held, and while it may constitute an irregularity, it does not constitute a badge of fraud, particularly where it has been effected with the active sanction of the holders of two-thirds of the shares of Marine Transit Corporation stock. If in substance the seven New Jersey corporations and the General Marine Transit Company, Inc., were wholly owned by Marine Transit Corporation, then form must yield to it.

The plaintiff directs attention to the fact that the Marine Transit Corporation shares on the books of the National Motorship Corporation were written up and subsequently written down. This affords no evidence that Schoonmaker was attempting to defraud

the plaintiff or any one else. What was written in the books of the National Motorship Corporation is of no concern to the plaintiff.

The plaintiff also complains about the inadequacy of the book-keeping system. While the system was not perhaps the best that could be devised, there is no evidence of falsification, no evidence of any entry, or the absence of any entry, that could have adversely affected stockholders of Marine Transit Corporation. An examination of the books discloses that all moneys paid to or on account of Marine Transit Corporation were fully accounted for.

Nor is there any proof to support the charge that Schoonmaker would become preferred over the debts of other creditors. By taking mortgages on six barges to secure repayment of money which was supposed to have been loaned to the Barge Corporation, Schoonmaker was not in the position of a preferred creditor. He simply became a secured creditor. There was nothing secretive about this transaction, and so far as the record discloses was not tainted by fraud. " A minority stockholder has no standing to set aside corporate acts of the directors with one of their number where such acts are not tainted with fraud and are made openly and in good faith, even though the contracting director eventually makes a profit therefrom." (*City Bank Farmers Trust Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62, 68.) As a matter of fact, with the exception of the barge *Barbara*, of which mention will later be made, the mortgages were satisfied of record, although not paid. Instead of reaping any private advantage to himself, Schoonmaker, who bargained for security for his various loans, found himself a general unsecured creditor.

The plaintiff claims further that the proceeds of the tug *Chilton* were never received by Marine Transit Corporation. This is not borne out by the record. The *Chilton* had been damaged in a collision with another vessel which resulted in a claim against it. The damage was repaired by Kingston Shipyards, Inc., the repair bill amounting to $1,388.77. Because of the claims outstanding against the *Chilton*, Fagan instructed Palmer to have it libeled for the repair bill instead of transferring it directly to the Chico Corporation, one of the New Jersey corporations organized to hold title to it. The libel was filed and resulted in a final decree directing the sale of the tug by the United States marshal. At the sale it was bid in for $3,600 by one Mills, the money or credit having been furnished to Mills by Schoonmaker. The marshal's bill of sale was made in the name of the Chico Corporation. After the proceeds were deposited in court, two checks were issued, one in the sum of $1,583.13 and the other in the sum of $1,914.20, representing $3,600, less costs. Palmer sent to the Kingston Shipyards, Inc., his

check for $1,262.25 (amount of repair bill, less his fee), and subsequently sent his check for $1,690.71, representing the balance of the surplus. The sums received by Kingston Shipyards, Inc., were credited against the tug *Chilton* and later adjusted to reflect a credit against the Marine Transit Corporation account. The $3,600 advance by Schoonmaker was entered on the books of the Chico Corporation as a credit in his favor on account of a loan. When the assets of the tug and barge corporations were retransferred to Marine Transit Corporation, the latter assumed the $3,600 obligation. The net result was that Marine Transit Corporation was credited with $3,600, less the cost and expense of the sale against its liability to the Kingston Shipyards, Inc., and still retained ownership of the *Chilton*, while Schoonmaker was out $3,600.

The plaintiff says that the retransfer of the assets to Marine Transit Corporation in 1934 evidenced an attempted restitution by the defendants when caught " red-handed " in the act of having diverted the vessels and their earnings from Marine Transit Corporation to their own selfish ends. Inasmuch as the record is barren of any proof that Marine Transit Corporation was in a worse position after the transfers than it was before, or that moneys belonging to Marine Transit Corporation were wrongfully diverted to any of the individual defendants, or that either the stockholders or creditors suffered any pecuniary loss by what was done, it seems more plausible to conclude that the retransfers were accomplished because Palmer no longer wished in his own language " to hold the bag " and because it was desirable at that time to reflect the true situation, namely, Marine Transit Corporation's continued and uninterrupted control over the fleet and the revenue which it yielded.

The best proof of the efficacy of the plan now attacked as fraudulent is that no vessel was seized during the time that the fleet was nominally owned by the New Jersey corporations, but that immediately upon retransfer of the fleet fourteen barges and five tugs were seized under an execution of the National Surety Company. This seizure leads directly to the second main point upon which the plaintiff relies.

2. The plaintiff asserts that the action of the directors of Marine Transit Corporation in filing a voluntary petition in bankruptcy while the corporation was still solvent resulted in an inestimable loss to the corporation and to its good will. The events which led up to the bankruptcy are as follows: In September or October of 1933 two judgments were obtained against Marine Transit Corporation totaling about $17,000. The National Surety Company as indemnitor paid off these judgments and, becoming subrogated to the rights thereunder, demanded payment of Marine Transit Cor-

poration. Then followed several conferences between Palmer and one of the attorneys for the National Surety Company in an effort to effect a settlement of the obligation. It was suggested that $5,000 be paid immediately and the balance in monthly installments of $2,000. At that time, because of an outstanding injunction order, Marine Transit Corporation was not permitted to pledge any of its vessels as security. They were either unable to raise the money or because of the pendency of the action were not inclined to advance any cash. When the claim was made on the motion for the appointment of a receiver of the assets of Marine Transit Corporation that Palmer was wrongfully holding the New Jersey corporation stock in fraud of creditors, Palmer made a declaration of trust and on or about February 8, 1934, returned the assets to Marine Transit Corporation. When the National Surety Company learned of the retransfer, it levied execution on a portion of the fleet. Because of another judgment obtained against Marine Transit Corporation, the indebtedness of the National Surety Company was increased to between $35,000 and $40,000. The National Surety Company threatened to sell the vessels, with the result that Palmer consulted Conroy, then attorney for Marine Transit Corporation, and later Shaine, an attorney specializing in bankruptcy. It was determined to be for the best interests of the stockholders and creditors of Marine Transit Corporation that a petition in bankruptcy be filed. This course was authorized at a meeting of the directors held on March 21, 1934, and was accordingly adopted. The court finds that the motive underlying the filing of the voluntary petition in bankruptcy was not to injure stockholders or creditors of Marine Transit Corporation, but to avoid a distribution of assets to one of the creditors to the exclusion of the others. So far as Marine Transit Corporation is concerned, the court finds nothing inherently objectionable in what was done.

The claim that the filing of the voluntary petition was a fraud upon the courts is effectually disposed of by the determination of the United States Circuit Court of Appeals affirming the order which denied the motion to dismiss the petition August 16, 1935. (*Matter of Marine Transit Corporation*, 79 F. [2d] 232.)

3. The plaintiff contends that six barges belonging to Marine Transit Corporation were conveyed to the Barge Corporation so that they could be used to secure loans that Schoonmaker might make to any of his companies. The claim is made that although the mortgages were executed and delivered to Schoonmaker, Marine Transit Corporation derived no benefit therefrom. The mortgages were given to secure advances said to be close to $40,000. The plaintiff

urges that of this sum approximately $31,000 went to National Motorship Corporation. Again the facts relied upon do not support the conclusion urged. In January of 1933 Palmer and Fagan asked Schoonmaker to advance funds needed by Marine Transit Corporation and National Motorship Corporation. Schoonmaker was unwilling to make any advances unless he was fully secured. Fagan assured Schoonmaker that he could arrange preferred mortgages on six of the barges. It was definitely understood at this meeting that the loans would be made to the Barge Corporation, which in turn would execute the requisite preferred mortgages and deliver them to Schoonmaker. The loans were made and the mortgages given. Although it was agreed that the loans were to be made to the Barge Corporation (beneficially owned by Marine Transit Corporation), Palmer was informed in January of 1934 that instead the Schoonmaker advances had gone through National Motorship Corporation, Marine Transit Corporation or General Marine Transit Company, Inc. He thereupon advised Schoonmaker, Jr., that the mortgages were not binding for that reason and suggested that they be canceled. Satisfactions of these mortgages were accordingly executed, with the exception of the mortgage on the barge *Barbara*, although the advances were not repaid. The use to which the proceeds of the Schoonmaker loans were devoted is not clearly disclosed, but since the mortgages have been satisfied of record and the barges are now free of incumbrances, Marine Transit Corporation cannot be held to have suffered damage. The significant fact is that Schoonmaker, who bargained for security, was left with an unsecured credit of $40,000.

4. The plaintiff charges that there has not been a proper accounting to Marine Transit Corporation by those corporations which operated the fleet during 1932 and 1933. Without setting forth a detailed analysis of the entries in the books of the various corporations involved during the period in question, the court finds after a study of the proof on this issue that the chart (Exhibit 7-J for identification) accurately reflects the condition of the books in evidence and discloses that there has been a complete accounting of all revenue derived from operation of the fleet and that all such revenue less the cost of operation was devoted exclusively to the use of Marine Transit Corporation.

5. Proceeding upon the assumption that Marine Transit Corporation never authorized payment of salaries to its officers, the plaintiff attacks as improper salary payments to Schoonmaker and Fagan during 1932 and 1933 " aggregating $18,000 per annum." The court is unable to ascertain the source of the plaintiff's figures. The evidence discloses that Schoonmaker withdrew the sum of

$3,297.60 by way of salary in 1932 and withdrew nothing thereafter. Fagan was paid $12,000 per annum during 1932 and the first half of 1933, and was thereafter paid at the rate of $7,500 per annum. The plaintiff has failed to prove, however, that no services were performed for the salaries received. The mere fact that one is an officer of a corporation does not preclude him from accepting compensation for work actually performed. (*Bagley* v. *Carthage, W. & S. H. R. R. Co.*, 165 N. Y. 179; *Lewis* v. *Matthews*, 161 App. Div. 107, 109.) Fagan managed the fleet of Marine Transit Corporation, and the record is replete with evidence of services performed by Schoonmaker not incidental to his office. " The value of his services as president is not to be measured by his attendance at the office or at the place of business." (*Murray* v. *Smith*, 166 App. Div. 528, 535.) Through his associates and employees Schoonmaker kept in constant touch with the business. Frequently he lent to the corporation his financial resources either by direct loans or by the guaranty of commercial paper. He advised the corporation and played a dominant part in shaping its policies. Under the circumstances it cannot be said that the salary paid to him was excessive.

6. The plaintiff attacks the propriety of certain legal charges made by Palmer, an attorney for Marine Transit Corporation. It cannot be seriously contended that Palmer did anything improper in receiving compensation for legal services performed in connection with the libel and sale of the *Chilton* or with the incorporation of the General Marine Transit Company, Inc., and the New Jersey corporations. The claims that the defense of the several directors in the present litigation was borne by Marine Transit Corporation is contrary to the facts. There was no proof offered that a single penny was expended by Marine Transit Corporation in defense of the directors. With regard to Palmer's submission in the bankruptcy proceedings of retainer bills aggregating $17,039.99 and covering a period of four years, it need only be said that the issue is properly before the bankruptcy court for litigation. If Palmer fails to prove his alleged agreements of retainer, his claim will be disallowed.

7. The plaintiff asserts that there were improper and unjustifiable charges between Marine Transit Corporation and the Schoonmaker companies. The gist of the complaint under this heading is that Marine Transit Corporation bore the entire expense of the Buffalo office, and that although the office at No. 17 Battery place in Manhattan was shared by National Motorship Corporation, Kingston Shipyards, Inc., Rome Transit Corporation, General Marine Transit Company, Inc., and the New Jersey corporations, there was no allocation of time among the companies, no apportionment

or intercompany adjustments until 1933, and improper prorating of office expenditure for 1932 and 1933, in that neither Rome Transit Corporation nor Kingston Shipyards, Inc., bore any part of the expense. There is no proof to indicate that the overhead of the Buffalo office should have been borne by any other entity than Marine Transit Corporation. While there was no apportionment of the New York overhead office expenses prior to 1932, there was such apportionment with the incorporation of General Motorship Corporation; the apportionment being between the General Motorship Corporation and Marine Transit Corporation for 1932 and General Marine Transit Company, Inc., in 1933. True, Rome Transit Corporation and Kingston Shipyards, Inc., did not share in the office burden; but this is of no importance, since Rome Transit Corporation was a wholly owned subsidiary of Marine Transit Corporation, and Kingston Shipyards, Inc., was a wholly owned subsidiary of National Motorship Corporation. The parent companies absorbed this fictitious item. If the subsidiary corporations had been charged with a share of the overhead, the result would have been no different, for it would have merely meant a decrease in the amount found due from the subsidiaries to the parent corporations.

8. The proof in the record does not support the claim either that the charter hire set up for the vessel *Express* was used as a means for building up fictitious charges against Marine Transit Corporation in favor of National Motorship Corporation, or that there was anything improper with respect to the accounting set up of the yacht *Grayland*.

Plaintiff makes many other complaints which are too trifling and picayune to merit comment.

The complete absence of any real basis for the many general charges of fraud, collusion, waste, gross negligence, etc., lends considerable support to the claim that the plaintiff's suit was not motivated by a desire to benefit the Marine Transit Corporation, and in this connection the plaintiff's association with Mr. Narelle, as president of the Seaboard Great Lakes Corporation, is highly significant.

The plaintiff's complaint is dismissed on the merits, with costs to all of the defendants separately represented, except Fagan.

### THE CROSS-COMPLAINT.

The defendant and cross-complainant Fagan claims to be the holder of 362½ shares of stock in the National Motorship Corporation. He says that in January of 1931 it was agreed that in return for services rendered, moneys advanced and credit furnished, there was to be issued to Schoonmaker and to himself in equal shares

6,000 shares of common stock and 2,400 shares of preferred stock of the National Motorship Corporation; that the National Motorship Corporation was to purchase from him the Diesel lighter *Express* and his Marine Transit Corporation stock for 11,500 shares of its common stock and 4,600 shares of its preferred stock; and that the National Motorship Corporation was to purchase from Schoonmaker his Marine Transit Corporation stock for 7,500 of its common stock and 3,000 of its preferred stock, and from the Kingston Dry Dock & Construction Company, Inc., owned by Schoonmaker, the Lower Island dock for 15,000 shares of its common stock and 6,000 shares of its preferred stock. The stock was accordingly issued, except that the 6,000 shares of common and the 2,400 shares preferred, which Fagan says he was to receive for services rendered, moneys advanced and credit furnished, was issued to Schoonmaker. Plaintiff claimed to be entitled to one-half of these shares. With the recapitalization of National Motorship Corporation and the reduction of its capital stock to 1,000 shares of no par value common stock, Fagan claims that his one-half interest in the stock issued to Schoonmaker amounts to $32\frac{1}{2}$ shares, which, together with the 330 shares issued to him in exchange for his stockholding prior to recapitalization, brings his present claimed stock ownership up to $362\frac{1}{2}$ shares. This claim must be examined in the light of the history of the National Motorship Corporation. It appears that on August 27, 1930, General Motorship Corporation was incorporated under the laws of the State of Delaware with 2,000 shares of no par value common stock. The name was later changed to Motorship Corporation and finally to its present name, National Motorship Corporation. The certificate of incorporation was amended on January 28, 1931, to provide for 200,000 shares of $25 par value preferred stock and 15,000 of no par value common stock. This seems to have been done for the purpose of negotiating a public sale of the stock. The corporation purchased two motor vessels for $260,000, payable $50,000 in cash and the balance subject to mortgages aggregating $210,000. The cash was furnished by Schoonmaker. As noted above, the total issued to Fagan was 11,500 shares of common and 4,600 shares of preferred, and to Schoonmaker 28,500 shares of common and 11,400 shares of preferred stock. Fagan's certificate was indorsed in blank.

That Fagan was fully advised of the issuance to Schoonmaker for his own use of the 2,400 shares of preferred stock and the 6,000 shares of common stock cannot be seriously disputed. The stock was issued in accordance with the minutes before they were altered at Fagan's request. Fagan never laid claim to these shares during Schoonmaker's lifetime. That he was content to treat them as

belcrging to Schoonmaker is evidenced by the fact that on several occasions he acknowledged with his signature that the stock was Schoonmaker's.

Furthermore, whether Fagan at one time was entitled to one-half of this stock is of no consequence. Kingston Shipyards, Inc., was organized by and became a wholly owned subsidiary of the National Motorship Corporation. Its function was to engage in shipbuilding and repair work. It was then that the Kingston Dry Dock & Construction Company, Inc., conveyed the dock and other equipment to the Kingston Shipyards, Inc., in return for 15,000 shares of common stock, and 6,000 shares of preferred stock of the National Motorship Corporation which was issued to Schoonmaker. For the purposes of the transfer, the value of the property was fixed at $92,000, it being understood that this sum would be realized from the public sale of the National Motorship stock. In December of 1932 it appears that all parties concerned were reconciled to the fa'lure of the public sale of this stock. The corporate capitalization of the National Motorship Corporation was thereupon changed to 1,000 shares of no par value common stock. Inasmuch as the ship-building and repair venture of Kingston Shipyards, Inc., did not prove successful, and in fact resulted in a loss of $30,000 per year, Fagan insisted that the property be returned to the Kingston Dry Dock & Construction Company, Inc. This the parties agreed to do. Subsequently at a meeting attended by Schoonmaker, Fagan, Palmer and Schoonmaker, Jr., it was agreed that the new stock in the National Motorship Corporation be distributed one-third to Fagan and two-thirds to Schoonmaker. The stock was accordingly delivered, the certificates having been dated as of the original date of issue. Fagan indorsed his stock in blank and delivered it to Palmer, presumably in accordance with the trust agreement, the terms of which will be considered later. All of this was done without the slightest intimation on Fagan's part that he was entitled to more than one-third of the stock of the National Motorship Corporation. These facts come squarely within the rule that a complainant is bound by a transaction where his conduct with respect thereto " subsequent to the rise of it, justifies and supports the normal and reasonable conclusion that he, by his assent thereto or acquiescence therein, has accepted and adopted it." (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113, 129.) No matter what Fagan's interest might have been in the corporation prior to that date, his rights were fixed by agreement at the meeting referred to. Fagan claims to be the owner of a majority of the stock in the National Motorship Cor-poration. The claim is made on the theory that with the transfer of the Lower Island dock to the Kingston Dry Dock & Construction

Company, Inc., Schoonmaker became obliged to return the 6,000 shares of preferred stock and 15,000 shares of common stock to the National Motorship Corporation, and since the shares were equivalent to 375 shares under the new capitalization, the Schoonmaker's estate is now left with only $262\frac{1}{2}$ shares against Fagan's $362\frac{1}{2}$ shares. The complete answer to all of this is the agreement already mentioned under which the new stock of the National Motorship Corporation was divided — one-third to Fagan and two-thirds to Schoonmaker — and Fagan's complete acquiescence in the division by indorsing his certificate over in blank to Palmer.

While the book value of the Lower Island dock was placed at $335,273.06, the entry itself affords no evidence of actual value. The fact that a public sale of the stock was contemplated at the time suggests perhaps the reason for the valuation. In the minutes of June 23, 1933, the value is fixed at $92,500, while the " Property and Equipment " account shows the value written down to $50,000. The court was not concerned with the true value of this property for the obvious reason that after its return to the Kingston Dry Dock & Construction Company, Inc., the parties by agreement redistributed the stock.

The charge that the Kingston Shipyards, Inc., stock is no longer owned by the National Motorship Corporation and the implied charge that it has been transferred to one of the defendants was not proved.

Fagan asserts that he is not indebted to the Schoonmaker estate. This assertion he bases upon the trust agreement of December 21, 1931, entered into between Fagan and Schoonmaker and later accepted by the Kingston Trust Company, and a letter alleged to have been written by Schoonmaker on the same date. The trust agreement recites Fagan's indebtedness to Schoonmaker in the sum of $53,295, which included three notes of $10,000 each executed by Fagan and delivered to Schoonmaker, with interest from January 3, 1927, together with an unpaid balance, and two of Fagan's notes, one for $8,000 and the other for $6,000, indorsed by Schoonmaker. The agreement also recites the deposit of Fagan's Marine Transit Corporation stock with Schoonmaker as collateral security for the said loans and the subsequent acquisition by the General Motorship Corporation of all of the Marine Transit Corporation stock held by the respective parties in return for its capital stock. To provide Schoonmaker with continued security, Fagan agreed that all of the shares of stock in the General Motorship Corporation standing in his name would be indorsed in blank and deposited with the Kingston Trust Company as collateral security for the payment of said loans. One of the paragraphs of the agreement reads as follows: " (6) It

is further agreed that it is the intention of the parties hereto that the said sums due or to become due by the said Gerald A. Fagan under this agreement shall be paid from the proceeds of the sale of any of the stock and/or out of any dividends on any of the shares of stock owned by him which he shall receive from the General Motorship Corporation; except that for the sums due on the notes or renewals thereto of Eight thousand ($8,000) Dollars and Six thousand ($6,000) Dollars, respectively, which the second party has indorsed, the said first party agrees to pay off and reduce them regularly as required."

The letter of December 21, 1931, a purported duplicate original of which signed by Schoonmaker was found in the files of the National Motorship Corporation, reads in part as follows:

" As explained to you the Kingston Trust Company would not accept the trust agreement which included two of your notes which I discounted with them. However, you will only be called upon to pay all your notes out of dividends on your stock. Any reduction in your notes through the sale of your stock or any payments on the notes will be shown on the trust agreement.

" The Marine Transit Corporation and the General Motorship Corporation notes which you endorsed personally will be protected by my estimate in the event of my death and any balance due me on your personal notes cancelled."

Fagan contends that with Schoonmaker's death he was released of all liability. The facts surrounding the signing of this letter are not disclosed by the record. The letter was admitted over objection and was permitted to remain in evidence after a motion that it be stricken out. The court's attention was consequently directed to the claim that the trust agreement was, as a matter of law, integrated in the writing. Under the circumstances, the admission of the letter into evidence does not preclude a finding at this time that it cannot be given probative force. (*Higgs* v. *De Maziroff*, 263 N. Y. 473.) The theory upon which the letter was offered in evidence is disclosed by the following quotation from the cross-complainant's brief: " The document, by its very nature, purports to record an oral agreement and does not purport, itself, to confer the rights, and the document need never have been delivered and need never have been in the possession of Fagan. If it were found in the possession of Schoonmaker and had never been seen by Fagan, it would still be admissible in evidence and would still prove that Fagan and Schoonmaker had an oral agreement, by the terms of which none of the notes were absolute obligations of Fagan but were payable solely and only out of dividends of the General Motorship stock."

The theory seems to be that the letter evidences a collateral oral agreement entered into contemporaneously with the execution of the trust agreement. There is no proof in the record to support this theory. The record merely discloses that this letter was found in the files of the National Motorship Corporation some time in January of 1935. Assuming, however, that the requisite facts were proved, the requirement remains that before such an oral agreement can be received " at least three conditions must exist, (1) the agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing; or put in another way, an inspection of the written contract, read in the light of surrounding circumstances, must not indicate that the writing appears ' to contain the engagements of the parties, and to define the object and measure the extent of such engagement.' Or again, it must not be so clearly connected with the principal transaction as to be part and parcel of it." (*Mitchill* v. *Lath*, 247 N. Y. 377, 381.) It cannot be asserted here that the letter evidences a parol collateral contract distinct from, and independent of, the trust agreement. The two are intricately bound together. They both relate to Fagan's obligations and to the manner in which they shall be discharged.

The letter specifically refers to the trust agreement, and there is no suggestion that this alleged oral agreement was supported by independent consideration. The only discernible purpose for the introduction of this letter was to add additional terms to the trust agreement and by doing so to vary and contradict the terms already expressed. It is well settled that where an instrument appears upon its face to embody all of the terms of a valid contract, there may not be shown by extrinsic proof additional terms of the contract which might have been but were not included in the writing (*Edison Electric Illuminating Co. of Brooklyn* v. *Thacher*, 229 N. Y. 172), and particularly where, as here, the extrinsic proof tends to vary the terms of the writing. Nor may parol evidence be introduced to show that a contract delivered unconditionally was to be canceled upon some future contingency. (*Jamestown Business College Assn.* v. *Allen*, 172 N. Y. 291.) Further, since the trust agreement was sealed, its terms cannot be modified by a subsequent unexecuted parol agreement. (*Cammack* v. *Slattery & Bro., Inc.*, 241 N. Y. 39.) The recent amendment to section 342 of the Civil Practice Act by chapter 708 of the Laws of 1935 is not applicable to this situation. It follows that the letter can be given no probative force regardless of the theory upon which its introduction into evidence was predicated, and upon the state of the competent proof

now in the record a finding must be made that Fagan's obligations under the trust agreement still persist.

Fagan seeks relief both as pledgor of stock deposited as collateral security for the payment of his obligation to Schoonmaker and as a stockholder in the National Motorship Corporation. In his first capacity he charges Schoonmaker with having violated his duties with respect to the pledge, relying upon certain alleged acts which will be considered in the order in which they are set forth in the cross-complainant's brief.

*First.* The charge that Schoonmaker failed to declare dividends out of profits realized by Marine Transit Corporation was not sustained, for nowhere in the record was the court able to find any proof to show that available surplus which should have been distributed to the stockholders was improperly diverted from the corporation by Schoonmaker. As was said in *Liebman* v. *Auto Strop Co.* (241 N. Y. 427, 433): " It is a fundamental rule relating to the management of corporations that it is within the discretion of the directors to determine when and to what extent a dividend shall be made, subject of course to the qualification that the same shall not encroach on the capital. Courts will not interfere with such discretion unless it be first made to appear that the directors have acted or are about to act in bad faith and for a dishonest purpose."

The court finds no evidence of bad faith or dishonest motives.

Furthermore, the policy of non-payment of dividends was acquiesced in by Fagan, for there is no proof that he or any other stockholder at any time asked for a distribution of dividends. The mere statement that the surplus was used for the purchase of vessels from corporations controlled by Schoonmaker lends no support to Fagan's claim in the absence of some proof that these purchases were not proper corporate capital investments. No such proof was tendered.

*Second.* The charges relating to the transfer of the fleet to the New Jersey corporations, the failure to account to Marine Transit Corporation for the earnings of the New Jersey corporations, the filing of the voluntary petition in bankruptcy against the Marine Transit Corporation, and the delivery to Schoonmaker of preferred mortgages on six barges have been dealt with heretofore.

*Third.* Fagan takes the position that under the trust agreement of December 21, 1931, Schoonmaker was obliged to protect him against liability on the notes which he had either indorsed or signed as maker. From that premise he argues that Schoonmaker's refusal to renew two of the notes and the withdrawal of National Motorship Corporation funds, which precipitated protest of another note, constituted a violation by Schoonmaker of his obligations under the

trust agreement to Fagan's damage. The difficulty with the argument is the falsity of the premise, for under the trust agreement Schoonmaker was not obliged to save Fagan harmless from liability on the notes. Regardless of the motives which inspired Schoonmaker, both he and the Kingston Trust Company had a perfect legal right to do what they did.

*Fourth.* It is claimed that the Schoonmaker interest not alone failed to resist attempted foreclosure by the United States of America of its preferred mortgages on the motorships *Clevelander* and *Detroiter*, but actually co-operated with the mortgagee. The application for leave to foreclose was made while the National Motorship Corporation was in receivership under the order of Mr. Justice FURMAN. At that time Fagan was employed by the receivers and it does not appear that any of the parties now charged with malfeasance had any standing to resist the application. It is unreasonable to suppose that Schoonmaker, who had invested an additional $30,000 on February 9, 1934 (two months before the receivership), to stave off foreclosure of these mortgages would have co-operated in the destruction of his own investment. Fagan says Kinney volunteered information to William E. Collins, district counsel of the Shipping Board, which information he says was used by the government in its attempts to foreclose. Collins, it appears, was referred to Kinney either by Palmer or by his associate Barber. Kinney did not volunteer information, but merely responded to questions put to him by Collins, who at that time was checking the accuracy of statements contained in an affidavit filed by Fagan in opposition to the motion for leave to foreclose. There was no evidence of collusion, no evidence of co-operation on the part of either Schoonmaker, Palmer, Kinney, or any of the other defendants with the United States government.

*Fifth.* There was not a scintilla of proof offered to support the charge that the Schoonmaker interests caused the involuntary petition in bankruptcy to be filed against the National Motorship Corporation. Nor is there any proof to support the claim that Schoonmaker interests sought to destroy the pledge by causing an intervening petition in bankruptcy to be filed, or by filing excessive claims against the bankrupt corporation. Without analyzing in detail the extent to which the National Motorship Corporation was obligated to the Schoonmakers, it is sufficient to point out that such obligations closely approximate, if they did not actually coincide with, the sum mentioned in the intervening petition. It is difficult to understand how the Schoonmakers, who represented by far the largest creditors of the National Motorship Corporation, could be criticized for seeking to protect their interests by way of intervention in the bankruptcy.

*Sixth.* Fagan's complaint, concerning the barge *Barbara*, which is admittedly owned by the National Motorship Corporation, is that it was improperly transferred to the Barge Corporation and was thereafter improperly mortgaged to Schoonmaker without any consideration being paid to the National Motorship Corporation. Fagan, whose credibility was utterly shattered at the trial, must have made this complaint with his tongue in his cheek. The *Barbara* was built by the Kingston Shipyards, Inc., for the National Motorship Corporation, and there is no question but that it is still owned by the National Motorship Corporation. By inadvertence, Marine Transit Corporation, which owned only twenty-four barges, purposed to transfer to the Barge Corporation twenty-five barges, including the *Barbara*. The error was not discovered until the books of the Barge Corporation were set up. There was some uncertainty about the ownership of the *Barbara*. Schoonmaker, Jr., wrote Fagan that the Kingston Dry Dock & Construction Company, Inc., through which some of the barges were transferred to the Barge Corporation, did not own the *Barbara*. Fagan insisted that it did. It was in reliance upon that statement that a bill of sale for the *Barbara* was delivered to the Barge Corporation. There is no dispute concerning the fact that all revenue ever derived from this barge has been received by the National Motorship Corporation. The preferred mortgages on the six barges given to Schoonmaker included a mortgage on the *Barbara*. All of the mortgages were satisfied of record with the exception of the mortgage on this one barge which was left open because of the questioned ownership. Of course, this open mortgage in the hands of the Schoonmaker estate is not an incumbrance on the barge, for the simple reason that the barge was never owned by the purported mortgagor. In short, there is outstanding a worthless mortgage executed just as much by the inadvertence of Fagan as of anybody else concerned. Fagan must know that this error which may readily be corrected did not involve any fraud, nor did it cause him or the National Motorship Corporation to suffer any damage.

In his capacity as stockholder in the National Motorship Corporation, Fagan reverts to the transfer of the fleet to the New Jersey corporations, asserting that it was done (a) to force the plaintiff and Fagan out of Marine Transit Corporation and to leave the Schoonmakers in sole control, and (b) to prefer the Schoonmakers over *bona fide* creditors. His argument under (a) is that the plaintiff and he were left without stock in the New Jersey corporations and in the General Marine Transit Company, Inc., and the Marine Transit Corporation was left without any assets. This he claimed would inevitably lead to the bankruptcy of Marine Transit Corporation,

with ownership of the fleet in the New Jersey corporations and the General Marine Transit Company, Inc., which Schoonmaker controlled. But Palmer at all times held the stock of the New Jersey corporations in trust for Marine Transit Corporation and the latter's beneficial ownership was converted into legal title with the retransfer of the fleet. The facts underlying the transfer and retransfer have been considered in another part of this opinion. Under (b) Fagan complains that the earnings of the fleet were used to pay off notes which had been indorsed by Schoonmaker and to pay off the indebtedness of Marine Transit Corporation to the Kingston Dry Dock & Construction Company, Inc., which was owned and controlled by Schoonmaker. This contention has already been disposed of and merits no further comment except that Fagan was so intimately associated with this close corporation that it is unreasonable to suppose that he was not familiar with every transaction concerning which he now complains. This conclusion is supported by the " Capital Adjustments " memorandum, partly prepared by Fagan, which discloses that in the fall of 1932 he was familiar with many of the facts which he now claims were withheld from him.

The allegations in the cross-complaint that the Kingston Dry Dock & Construction Company, Inc., repaired vessels of Marine Transit Corporation at excessive charges and without competitive bidding and forced the sale of vessels of Marine Transit Corporation have apparently been abandoned, and properly so, inasmuch as no competent proof in their support was offered.

Finally, Fagan contends that Schoonmaker and Palmer violated their duties as officers and directors of the National Motorship Corporation, as did other defendants controlled by Schoonmaker and Palmer. The alleged wrongful acts relied upon are those previously discussed and which consequently require no further consideration.

The cross-complaint of Fagan is dismissed, with costs to the other defendants separately represented.

At the opening of the trial, all of the defendants, with the exception of the executors of the estate of John D. Schoonmaker, deceased, and Gerald A. Fagan, moved to dismiss the complaint and cross-complaint on the ground that the causes of action therein stated belong solely to the Irving Trust Company, trustee in bankruptcy of Marine Transit Corporation. The motions were denied. They were renewed at the end of the plaintiff's case and again denied. The voluntary petition in bankruptcy was filed on March 21, 1934, but the trustee was not elected until February 25, 1935. Under the Bankruptcy Law (§ 70, as amd.; U. S. Code, tit. 11, § 110) it has been held that a " claim against directors of a bankrupt

corporation for damages due to their misconduct passes to and may be enforced by the trustee." (*Stephan* v. *Merchants Collateral Corp.*, 256 N. Y. 418, 421.) The trustee became vested by operation of law with title to the property of the bankrupt corporation as of the date of adjudication. Should the trustee, however, elect to abandon the claim in suit, the bankrupt corporation, and through it in a representative capacity the plaintiff and the cross-complainant, may continue the litigation. (*Johnson* v. *Collier*, 222 U. S. 538; 32 S. Ct. 104; 56 L. Ed. 306.) While the trustee was not elected until February 25, 1935, it had acted as receiver in bankruptcy since March of 1934, and in that capacity was fully advised of the pendency of the State court actions. On April 16, 1935, the trustee moved in the United States District Court for the Southern District of New York to restrain prosecution of the instant action on the ground that until determination of the appeal taken from the order denying the motion of the plaintiff and cross-complainant in this action to dismiss the adjudication in bankruptcy, it would make no decision with respect to intervention in this action. The plaintiff and cross-complainant moved in the same court for an order restraining the trustee from interfering with the instant action. The latter motion was granted and the trustee's motion was denied. These motions are mentioned and are important here only in so far as they disclose that the trustee in April of 1935 had made no decision with respect to the instant suit. It is, therefore, difficult to find as a matter of law that the trustee has elected to abandon the claims which form the basis for this action. Inasmuch as this court has examined all of the issues after a long and protracted trial and has determined to direct a dismissal of the complaint and of the cross-complaint on the merits, it is not essential that the question with regard to the right to maintain the action be pressed to an ultimate determination.

Settle findings and judgment in accordance with the above on notice. While it has taken twenty-three days to try this case and while close to 600 exhibits are now in evidence, only the salient facts are covered in the opinion, and it is suggested that counsel in preparation of their findings and conclusions limit themselves accordingly.